Shalleck, J.
In these summary proceedings the landlord seeks to recover possession of office premises from its several named tenants on the claimed ground that they held over after the expiration of their terms. Justification for their continued possession as statutory tenants lies solely in the permissive provisions of the Business Bent Law (L. 1945, ch. 314, as amd.) as re-enacted and extended hy chapter 701 of the Laws of 1955. This enactment precludes dispossession of a tenant from office premises after the expiration of his lease so long as he continues to pay the rent and otherwise complies with his statutory obligations as a tenant. (§ 1.)
Each of the tenants has appeared in this proceeding. All have generally denied the allegations of the landlord’s petition. The Attorney-General, who has appeared herein and also interposed a general denial, defends the legality of the aforementioned statute (Executive Law, § 71).
The landlord challenges the constitutionality of the Business Bent Law (L. 1955, ch. 701). It argues that that law violates the due process and equal protection clauses of the fourteenth Amendment of the United States Constitution and sections 6 and 11 of article I of the Constitution of the State of New York as well as the contract clause of the former (art. 1, § 10) and the prohibition against taking private property for public use without just compensation contained in the latter (art. 1, § 7).
The substance of the challenged statute is not new. Its source finds root in an emergency of over ten years ago (L. 1945, ch. 3). It was at a time when the end of World War II was not yet here. The 1945 Legislature enacted other comprehensive laws intended to cover living and working premises of most kinds, including offices and retail stores (L. 1945, ch. 314). These laws hy their terms were applicable only to cities having populations over 1,000,000 people. Hence they embraced New York City alone.
Constitutional tolerance for such laws was founded firmly in a declaration of public emergency requiring the exercise of police powers by the State. This followed an exhaustive investigation of the situation. The Legislature declared (L. 1945, ch. 314, § 1): “ Section 1. Unjust, unreasonable and oppressive leases and agreements for the payment of rent for office space and retail stores and other business space in certain cities having been and now being exacted by landlords under stress of prevailing conditions accelerated by the war, and an abundance of eviction proceedings against tenants having been commenced or threatened by landlords, whereby breakdown has taken place in normal processes of bargaining and freedom of contract has become an illusory concept, and whereby there *562 have come into existence conditions threatening to obstruct war production, and the production and distribution of essential civilian commodities, and the rendition of essential services, professional and otherwise, and to divert essential manpower, materials and transportation facilities, and to cause inflation, and all of the foregoing situations and conditions being a threat to the successful prosecution of the war and essential civilian activities, and to the public safety, health, and general welfare of the people of the state of New York, it is hereby declared that a public emergency exists, which is increasing in intensity without slackening and without promise of relief so long as present war conditions continue, and that action by the legislature is imperative and will not admit of delay. It is hereby found, therefore, as a matter of legislative determination, that for the duration of such emergency, the establishment of a maximum rent for office and retail store and other business space at a level of fifteen per centum above rents charged on June first, nineteen hundred forty-four or at a level otherwise determined as hereinafter provided, will curb the evils arising from such emergency and will accomplish the purposes hereof. This act is declared to be a measure designed to protect and promote the public health, safety and general welfare, to aid the successful prosecution of the war, and essential civilian activities, and to conserve manpower, essential materials and transportation facilities, and to prevent inflation, and is made necessary by an existing emergency.”
This was the same emergency which impelled the enactment of the Commercial Rent Law (L. 1945, ch. 3, § 1; Matter of Court Square Bldg. v. City of New York, 298 N. Y. 380, 385).
There was good reason for the Legislature to have recognized the crying need for public protection, and to have acted as a consequence thereof. Lest the memories of any of us have dimmed over the years, it may be well to be reminded of the fretful struggle for survival, with its concomitant need for supply to our armed forces and civilians, necessitating rationing of all commodities, whether consumer items or places to live and work. For without required control, inflation would have offset the effort expended in defense of our democratic way of life.
The committee’s report, which urged the enactment of the Commercial Rent Law which ensued, based its conclusions on its findings that “ the health, morals, safety and general welfare of the People of the State of New York, as well as the safety of the Nation, and the successful prosecution of the war and essential civilian activity ” (N. Y. Legis. Doc., 1945, No. 2, *563 p. 18) forced this very kind of legislative action. These findings and. purposes of the law were echoed by the Governor in his message approving the bill. Similar findings and approval, with change of emphasis only, can be found in the same documents with respect to the Business Rent Law.
The basis of the original bill was the public emergency. Though challenged at the time, no one had the temerity to advocate that the facts and emergency conditions which bottomed the legislative determination were nonexisting. The court had little difficulty in finding constitutionality with respect to the Commercial Rent Law (Twentieth Century Associates v. Waldman, 294 N. Y. 571) and later in 1949 in holding that the companion Business Rent Law required similar judicial pronouncement. (Matter of Court Square Bldg. v. City of New York, 298 N. Y. 380, supra.)
The basic political concept of Americans which prompts abhorrence of any regulation destined to shackle freedom of personal or economic life, constrained the Legislature to continue to ‘ ‘ watch dog ’ ’ developments in the rent field, over which it had so comprehensively taken control. In 1948 a temporary State commission was created to study rental conditions of commerce and business. It had, among other of its reportorial duties, the responsibility to keep abreast of the facts currently in order to advise the Legislature as to whether conditions have changed which require change in law.
The Commercial and Business Rent Laws were re-enacted by the Legislature, with amendments ostensibly reflecting slightly changing conditions and requirements, from year to year. In its 1953 report to the Legislature the temporary State commission evinced a belief that the necessity for controls was diminishing. However, the Legislature continued the legislation for an additional year (N. Y. Legis. Doc., 1953, No. 43; L. 1953, chs. 451, 452).
As far as the record before me shows, the last full important meeting of the temporary commission was held on December 15, 1953. At that time it proposed to further its then study of conditions in order to be fortified with current facts reflecting public requirements, if any. The study, it stated, would not be complete in time for the 1954 legislative session. It so reported to the Legislature (N. Y. Legis. Doc., 1954, No. 58), and the Legislature, declaring the emergency to be still extant, re-enacted the control laws, to be effective for an additional year (L. 1954, chs. 446, 447). The following year, based upon the commission’s report (which referred to no further survey which was contemplated in its immediately preceding report) *564 and upon public hearing, the Legislature extended the laws to July 1, 1956 (L. 1955, chs. 701, 702). It is the former which is here attacked.
The result in this action cannot easily be reached. It involves some basically deep concepts of constitutional law and an equitable balance of the facts — including human experience — within the ambit of that legislative enactment and those provisions of the Constitutions. The severity of proof required in the solution of the problems presented impressed sufficiently to warrant the taking of about 2,000 pages of testimony on the trial, the offering of 235 exhibits by the landlord and 30 by the Attorney-General, the taking of 170 pages of pre-trial minutes, and the submission by counsel of many hundreds of pages of briefs.
As for the merits, the landlord’s fundamental attack on the legality of the statute is based on a contention that there was an absence of emergency. By that is meant “ the absence of the facts sufficient to justify the exercise of the police power referred to in the legislative findings, or any situation bearing on the health, safety or general welfare of the State.” It cites the minutes themselves of the State commission as clearly expressing this to be so, since they do not disclose a survey as to business or commercial space, or any pertinent study justifying the declarations of emergency in the statute.
In refutation of this stand, the Attorney-General points to the public hearing that was held March 18, 1955, preceding the commission’s annual report to the Legislature, and which culminated in the passage of the present law. He stresses that a full and open hearing was had, that the pros and cons of continued legislative supervision were fully aired by the interested parties appearing at the hearing and that serious discussion of all facets of the problem by the members of the commission took up considerable time.
The commission’s report proposed (N. Y. Legis. Doc., 1955, No. 73, p. 15) “ the continuance of the emergency laws for another year, ’ ’ although the emergency itself had ‘ lessened in severity ”. Its recommendation embodied provision for “ gradual decontrol” to “be accomplished without disruption or dislocation.” No member of the commission dissented from these recommendations as they affected business and commercial space.
The landlord makes much of the failure of the Attorney-General to produce a survey of facts concerning business space. Especially it claims this is so in view of the commission’s own *565 recorded minutes that such a survey was required in order to be fully informed.
There was no direct testimony that no survey had been made. A subpoenaed request for any recent survey was not fulfilled, however. In addition, the chairman of the commission, while on the witness stand, claimed a legislative privilege and refused to answer a direct question as to whether or not the commission had conducted such a survey.
I am convinced from these facts and from other omissions of affirmative revelation of the existence of such a survey, that none was made. And I so find. Query, however, whether the absence of a survey, by itself, is sufficient to invalidate the statute as unconstitutional? Would it be determinative, alone, of illegality and of a finding of freedom from an emergency situation? I doubt whether the landlord would so argue. At best it could be an element, cumulative with others of cognate nature, adding weight to the landlord’s presentment.
Realizing that fact, the landlord next levelled his equally serious contention on the claimed cursory character of the public hearing of March 18, 1955. Here the point is made that the hearing developed no facts in justification of the conclusion that an emergency still exists. The basis on which the statute was passed would only be, according to its declared purpose, the threat to the health, safety and welfare of the public and the prevention of the exaction of excessive rents when business space was insufficiently available. The landlord claims that the hearing produced no such testimony as to support any of the statute’s declared purposes. Indicative of that fact, it is contended, is the closing of the commission’s office the very day the statute here under discussion took effect, the cutting of the commission’s staff, and moving to a remote place outside the site where the emergency was, at least at one time, undisputed.
The landlord, however, was not content to rest here either. Nor could it; for it is generally no easy task to upset the constitutionality of legislative action. Affirmatively it undertook, through real estate experts, brokers, agents, owners of property, an economic expert, as well as by the production of statistical data, to prove the absence of an emergency, despite the finding in the statute to the contrary.
One of the main considerations in this regard is whether the tenants are in a reasonable bargaining position; in other words, whether tenants have a choice between competing space — a fluidity of movement. This, of course, can be effective only if there is no dearth of available business space.
*566 In its argument the landlord states that its evidence established “ the fact of fluidity beyond peradventure of doubt ” by proof that a release of space by the Government, movement of tenants into recently erected new buildings, with concomitant movement into the vacated space in prime buildings by tenants in nonprime buildings — all contribute initially to the accelerated rate at which space is becoming available. Contemplated buildings, as well as buildings now in the process of erection, are constantly adding to the freedom of choice of prospective tenants of business space, it claims. Further, because vacancy problems are beginning to arise from these movements, it is claimed that landlords are compelled, in order to accommodate and entice tenants, to do things, such as cut large areas into smaller units, give free rent concessions, alter, renovate and improve property, none of which they had to do before. These facts are claimed to be supported by the keen competition among landlords. Examples are the freedom of negotiation prospective tenants now enjoy (as distinguished from the landlord’s unique and unilaterated position of which he took advantage during emergency periods), the fact that even in choice prestige buildings the landlord must still negotiate with the tenant because of the growing plethora of that type of building, as well as his having to employ brokers, to advertise, to canvass tenants, and even to ‘ ‘ raid ’ ’ older buildings for tenants. It even gave some instances of rent reductions on rerenting in order to keep space from becoming vacant.
The landlord further attempted to prove through its witnesses, and argue in its briefs, that despite all these present efforts of landlords to keep their buildings rented, there are sufficient vacancies generally (some for long periods) to create fluidity in the market and make for a competitive situation, thus resulting in a fair bargaining and negotiating position on the part of tenants. This, then, destroys any claim of emergency, it contends.
As for the declaration of emergency in the statute, the landlord states that none of the recitals which might have been justified ten years ago can be sustained now. Its argument, naturally, is based upon the assumption that it has proved the premise, namely, that there is competition, that the tenants are in good bargaining position, because “ there is space to meet the existing demand and there is no shortage of space when measured against the demand ” and the like.
The Attorney-General counters with the argument that the new space in the prime luxury buildings is being rented on a large scale only by the larger companies whose business expan *567 sion demands more space regardless of price. This space in new buildings is still not sufficient to meet the requirements of even that class of tenant. Until this demand for space satisfies expansion at all levels of industry, there is no adequacy, he claims. Therefore there exists no present equality of bargaining position. Smaller tenants are still left to ferret for themselves for space in older, fringe buildings. The emergency is, as a result, lessened only in minor degree. The main obstacle to fluidity is still with us.
In addition, he relies on the testimony of many real-estate owners, agents and brokers before the commission, none of whom recommended complete decontrol. At most their suggestions were for gradual relaxation of controls so as to attune the legislation to the attenuating conditions. Further argument is also made that speculation upon the availability of future buildings should not be considered on the question of present fluidity of movement. He claims that the criteria should be confined to the present and should not include space not now, and only in the near future, available. He justifies his contention on the obvious probability that when sufficient space comes into being, the Legislature will most assuredly decontrol accordingly. With this there can be little disagreement. It does not, however, precisely answer the pressing immediate problem of whether there is sufficient availability of space to offset the legislative finding of emergency.
The Attorney-General presented no affirmative proof on any of the important issues before me. His was a negative approach, contenting himself to rest on a possibility that the landlord would not be able to carry the heavy burden of demonstrating the law’s unconstitutionality. Although constantly advised by an expert at his side at the counsel table, he called no one as a witness to dispute the landlord’s weighty evidence.
This is a proceeding that transcends the mere dollar and cents outcome of normal litigation between two private individuals. No such private quarrel existed here. This was a most serious litigation affecting untold numbers of people and involving a question of legislative prerogative not lightly to be considered. The Attorney-General underscores this appraisal in his memorandum after trial.
Apparently it was of sufficient importance to warrant the hiring of special counsel to try most of the litigation. It might have been equally helpful if affirmative proof were adduced by the Attorney-General in an effort to enlighten the court with more facts than with argument.
*568 The landlord’s attorneys produced evidentiary support for all of its contentions. The presentation was forthright and clear. It was of great assistance to me, albeit I was not able to accept all of it with the precise weight the landlord would wish me to give it. Testimony and proof was adduced by it with care and deliberation.
However high the calibre of landlord’s proof may have been, nevertheless it is impossible cavalierly to conclude that there are convincing facts showing that no emergency exists. We must apply our analysis to the existing situation in the light of legislative findings which “ are entitled to great weight and the legislative remedy will not be stricken down unless its invalidity is clearly established ” (East New York Sav. Bank v. Hahn, 293 N. Y. 622, 627).
From year to year as the sequential control laws came into being, the Legislature made separate declarations of the public emergency. In the main they reflected in identical language the same emergency which was the genesis of the original enactments.
Naturally some of the language changed from the original, for when the war was over, reference to it could not be made. Similarly, when there was no longer war production, or war conditions which could be the subject of legislative observance, these phrases of the original declaration were expunged.
This is not to say or even reflect, by such factual reference by me, that there was any less emergency by reason of the Legislature’s failure to declare it in new or different terms. Comment is made only because of the point made of it by landlord’s counsel. Whether a new cover on an old book would change the contents any more than keeping the old cover on, is the case here. It requires the examination of the contents to see if the emergency still exists. The emergency does not depend solely upon the presentation of the contents in a new cover.
Counsel for the landlord laudably concedes that the Korean conflict of 1950 “ necessitated the reimposition of some controls in modified form ’ ’; but, it contends that by 1955 there was a reconversion to peacetime activities to the extent that the immediate perils to the economic and social life of our country which gave rise to the original business rent controls as part of our democratic way, were no longer with us. The President’s State of the Union messages of 1954 and 1955 are cited as supporting this position. And, I admit, a cursory reading is quite convincing in that regard. The intimations thereof, however, are not that clear upon more reflective analysis.
*569 No one may cavil with the colloquial statement that generally ‘ ‘ times are good. ’ ’ This is the theme which runs through the rubric of these messages. Ordinarily that should allay fears of a present emergency. But there are certain guarded caveats in these executive messages. Expressions such as “ So, today, the transition to a peacetime economy is largely behind us ” (Congressional Record, vol. 101, pt. 1, p. 124) carries a banner of warning that we are not quite out of the quagmire of national emergency. All the more so may this be true in view of the many billions of dollars — and this year is no exception — requested over the past years by the Chief Executive and appropriated each year by the Congress under general heading of “ Defense.”
More recently the President, in his economic message to the Congress, expressed most optimistically the growing stature of the nation’s wealth with its multi-hundreds of billions productivity, by forecasting even better times to come. In that same message, however, he asked Congress for “ standby ” controls to forestall a possibility of inflation because of certain monetary activities of our population.' We should not lose sight of the fact that the current declaration of emergency contained in the act here under discussion includes the statement that it is a “ measure designed * * * to prevent inflation ” (Business Rent Law, § 1).
With it all, however, one may properly ask the question: “ How long is an emergency”? It is the answer which is difficult, for so many factors enter into it — factors which may differ only slightly in degree from year to year.
The ineffectiveness of the statute should be declared immediately upon the cessation of the emergency, for it is at that moment that the constitutional basis for the exercise of police power falls. Consequently, whether the emergency has devolved from year to year so that there is now an emergency in fact, is the real issue.
I am unimpressed by any contrary argument tendering a different issue. The “ practicality ” of the Legislature now being in session, thus intimating that the lawmakers should not be hampered with a possible adverse judicial determination, is hardly a reason for the judiciary not deciding a matter on the merits. No judge should be so deterred.
However, I am impressed by the argument that despite improving conditions, gradual decontrol over the tapering-off period would best serve the interests of the people as a whole ”. The landlord maintains that under these conditions “ the facts would have to show that immediate decontrol would itself create *570 an emergency condition and threaten the public health, safety and general welfare In this regard, it claims, there is no such proof.
My own appraisal of the proof and record before me leads me to conclude that the landlord is somewhat mistaken in stating that there is an absence of proof. It is true that defensive proof was not directly or affirmatively offered. As I stated before, it was in the nature of negative, rather than positive proof. It must be rated as proof, regardless. Actually, then, the landlord’s argument is directed to the quantum, of proof. And when considered in that aspect, the landlord is in error in characterizing it as no proof at all.
Nor can I conclude that there was an absence of record before the commission. While the landlord may quarrel with the kind of proof before the commission, and even with the paucity thereof, nevertheless -it is not my function to quarrel with the Legislature as to its assessment of the value of that proof. What ‘ ‘ considerations which move its members to enact laws ’ ’ is a legislative function. I cannot “ assume that its action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is applied, it was not aware of facts which afford reasonable basis for its action ” (Carmichael v. Southern Coal Co., 301 U. S. 495, 510).
Witnesses appearing at the trial on behalf of the landlord included those who had previously testified on the public hearing of the commission. There testimony at that hearing was on the whole consistent, one with the other. None of them advocated an immediate cessation of controls as they affected business space, as the sole way of correcting the situation. All intimated, if they did not directly so state, that a gradual relaxation of controls during a transition period would be a preferable method of handling this very difficult situation.
The landlord vehemently disputes that this is any criterion whatsoever in the determination of whether an emergency exists as a matter of fact. With this I disagreed; although I do agree with its argument that it is not a question for this court to decide whether “it is wise or desirable for there.to -be rent laws in this state ”. Just as such wisdom is a matter for the Legislature, so do I believe that the weighing of the information furnished by the afore-mentioned witnesses for the purpose of basing their decision on a proposed statute, is also solely within the competence of the legislators. I doubt whether I am empowered to substitute my determination for theirs, unless it is so patently contrary to human experience as to mock credulity.
*571 As I have previously stated, police power of the State to enact the controls legislation is sanctioned by an emergency. The determination of the facts of the existence of such emergency is at least initially lodged as a matter of constitutional law, in the Legislature. My review, under that Constitution, is limited to a finding that there was no reasonable basis for the Legislature’s determination. Hence the caution with which this problem must be approached and the difficulty of proof attendant upon the attack made on such determination. It is therefore with great constraint that I cannot accept the landlord’s argument and proof that there was a failure ‘ to point to a single fact showing an emergency ’ ’.
This court deals with questions of tenancies of every kind and nature every day. Proceedings by the thousands are brought and disposed of here, since this court has been uniquely devised by the Legislature to have jurisdiction over them. I have presided over such proceedings for longer than a quarter century. During that period, which has taken me through several cycles of differing landlord and tenant positions, I have come to know current as well as past conditions. I cannot blind myself to facts with which I come in contact daily.
Judicial notice dictates an acceptance of the fact that the center of business activity of all kinds is in the borough of Manhattan. Equally, businesses are sectionalized in that borough as far as location is concerned. I suppose this method of congregating in certain portions of the city by type of business grew up for economic reasons. It also may have been the result of convenience in relationships among similar business firms or for the accommodation of buyers. Regardless of the reason for its genesis, however, the fact of such sectionalization must be recognized.
Thus, for example, the banking and financial institutions have their main offices in the Wall Street section, the shipping industry in the lower part of Manhattan, the produce market on the west side of downtown, the fur business in the middle twenties and lower thirties on the west side, the garment district in the upper thirties and lower forties in the Seventh Avenue and Broadway areas, the advertising business on Madison Avenue in the forties and fifties. It is an economic necessity, therefore, that because of the tradition of industrial concentration, for every business to have office or business space within the concentrated area of that particular kind of business. Without it, such business will generally not flourish.
There are, of course, periodic movements of particular kinds of business from one section of Manhattan to another. These *572 changes are not frequent. But once an exodus of one large concern in an industry is made from one concentrated location, the other firms in the same industry are bound to follow quickly to the new location. Thus within a short time the new location becomes the center of that particular line of business. All available space in that area is soon at premium price, while the vacated space may go begging for tenants for some time.
By these occurrences one cannot honestly say that because rental areas are available in the old district that the emergency is over. So to conclude is in effect to overlook the scarcity of space in the new district which generally goes to the highest bidders. The tendency these days is for such movement to take place to the site of the new luxury buildings recently built.
While this matter was sub judice, and in the course of my writing this opinion, I had occasion to find examples of public pronouncements to this effect which justify my statements. I was sufficiently impressed by their support to have inserted reference thereto now. They fortify the conclusions I have already reached. One of these examples was an article in the real estate section of the New York Sunday Times on February 19, 1956. The opening sentence reads: “ A strong demand continues for new office space in Manhattan ’ \ The tenor of the entire article indicates quite clearly that the need for continued building of competitive space has not lessened and ‘ ‘ the demand has not subsided ’ ’.
The second example was a statement of one of the landlord’s experts who testified on the trial of these proceedings. In an interview for the industry paper “ Realty ”, issue of Tuesday, February 21, 1956, he stated that because of the “ continuing removal of important textile firms from the Worth Street market — a new use for real estate in the downtown textile area will have to be sought.” He advocates patience and farsightedness “ during this transitory period”.
The logical effect of this is simple to deduce. If the size* of the new business district is restricted, so that not all firms in that line may move, either because of lack of space or exorbitant rentals, then those companies must remain in the fringe area no longer entirely devoted to their industry. It means loss of business; it means deterioration of the old area; it means the creation of what I may characterize as a “ business ghetto.”
Such a consequence does not do away with an emergency — if there is one — because most of the firms may be accommodated in the new locations. It is simply a shifting of requirements — unfulfilled requirements — from one place to another. *573 It does not actually change a bad bargaining position to a good one or create a fluidity of movement which would generally dispel the notion of any emergency. It seems to me that it is only when accommodation of all segments of industry, without discrimination as to size or wealth, becomes available, that it can safely be said that the emergency is at an end.
There are other causes for vacancies. Some of these causes do not impinge at all upon an emergency. Assuming the premise that landlords may be entitled because of the state of the economy, to slightly higher rents (as here argued), some of them place rents so high on the property sought to be leased, that no prospective tenant would agree to pay it. While business may be in a prosperous state at this time, business tenants do not intend to take their landlords into partnership with them by paying unjustifiably high rents. Hence the space remains vacant for lack of tenants willing to pay the high rentals asked.
While this fact does not necessarily tie in with the question of emergency, it is logical to infer that if space were so free as to put tenants in a favorable bargaining position because competition among landlords was rife, there would be less likelihood for landlords to try to exact higher rentals than the type of space could demand on the open market.
So that, although the fact that rentals would be increased if controls are removed (I presume the landlord means a reasonable increase) would not necessarily provide the basis for their continuance, there is no logical reason for agreement with the landlord’s argument that the test of the end of the emergency should not depend upon ‘ ‘ the availability of space for every tenant at the rent they wanted to pay ’ ’.
I cannot agree because in this theoretical argument the landlord loses sight of realities and of its earlier assertion that the tenants are in such favorable position because of competition, that landlords generally negotiate leases these days on tenants’ demanded terms. As for the reality of our daily experience I can only rely upon the many holdover proceedings which have come before me personally and the thousands of others in our court which are based upon the most technical aspects of the tenant-landlord relationship. By that I intend only to state my observations and not in any way to demean the stands taken by landlords.
My comment arises from no illusory or ephemeral source. It stems from the actuality of a repetition of similar proceedings directed primarily against statutory tenants. For instance, the “ quit and surrender ” — “ broom clean ” clauses of leases, so recently the subject of appellate determination, have been *574 used by landlords as a means of dispossessing tenants whose lower rents were fixed by the controls statutes.
Strained construction of these and other parts of leases will cause an untold number of litigations to be brought. I fear that some owners of property are awaiting impatiently the day when they can pounce upon the believing tenants — those whose unwariness is now defended by statute.
The question I have to decide is whether the controls statute no longer has any basis in fact, so that the constitutional protective cloak may be stripped from it. The function of examining the validity of the Legislature’s exercise of its power lies with this court. (St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 51-52; Matter of Cohen v. Starke, 269 App. Div. 256, 261; Home Bldg. & Loan Assn. v. Blaisdell, 290 U. S. 398, 441-442; East New York Sav. Bank v. Hahn, 293 N. Y. 622, affd. 326 U. S. 230, supra.) So that I am duty bound, if I find that the facts adduced before me do not, cumulatively, encompass the elements of an emergency which permitted the Legislature to act originally, to strike down the statute as unconstitutional.
As was said in Home Bldg. & Loan Assn. v. Blaisdell (supra, p. 447): “The legislation is temporary in operation. It is limited to the exigencies which called it forth * * * and the operation of the statute itself could not validly outlast the emergency”. (See, also, Orinoco Realty Co. v. Bandler, 233 N. Y. 24, 29; Twentieth Century Associates v. Waldman, 294 N. Y. 571, 580 et seq., supra; Block v. Hirsh, 256 U. S. 135, 157; Chastleton Corp. v. Sinclair, 264 U. S. 543; Peck v. Fink, 2 F. 2d 912, 913.)
These cases mark the bounds of my determination. Yet that narrow area holds within it a conflict not easily resolved; for the proof on either side is not of such a nature that no two reasonable men may differ concerning it. This, despite the fact that I am taking the law as to the burden of proof to be as advocated by the landlord — that clear and convincing evidence is the standard to be used in determining that no emergency exists today with regard to office space ”, as opposed to that claimed by the Attorney-General to be applicable, namely, proof beyond a reasonable doubt.
The landlord has gone a long way in its proof. I state unequivocally that it is as full and as complete as anyone could have presented it. However, under the circumstances of endeavoring to overcome legislative findings that there is an emergency, the difficulty of convincing proof is manifest. For upon an inquiry such as this ‘ ‘ legislative findings are entitled *575 to great weight and the legislative remedy will not be stricken down unless its invalidity is clearly established” (East New York Sav. Bank v. Hahn, 293 N. Y. 622, 627, supra).
I must conclude, under all the circumstances, that the evidence was not so clear or convincing as to sway my determination to a factual finding that no emergency exists. Were I so convinced, I would have no hesitation at all to declare the statute unconstitutional. My reluctance to hold the statute to be invalid is not because this is a court of first instance. It is, besides the reason just given, born of what may happen as the result of a contrary holding. I fear that the striking down of this business rent control statute would create more tension, distress and chaos in the business areas than if the law had never had existence. It would be in effect a highly destructive legal atomic bomb.
The pulse of the many cases of summary proceedings brought in this court is felt by everyone of its justices. If the emergency as declared by the Legislature is abruptly terminated by my juridical fiat, the flood gates of eviction proceedings will burst open. Disorder is bound to follow. It is this court’s duty to avoid such foreseeable result. It is also my duty as one of its justices, to decide this matter on the law as I see it and apply it to the facts as I find them to be proved. Being bound by the legal pronouncements of my limitations, the onus of a reversal of legislative findings must now be upon the Legislature itself, for they have not been sufficiently disproved before me.
I do not know, of course, what possible legislative action may be taken. I would suggest, however, that whatever termination date may be set by the Legislature, be coupled with discretionary powers in the justices, to be invoked in the same manner as the discretion they have now under section 1436-a of the Civil Practice Act. Such discretion would allay fears and insure calmness. It would make understandable the termination of the emergency.
Final order is awarded in favor of each of the tenants dismissing the petition on the merits.