Bernard Klieger, J.
Plaintiff New York City Housing and Development Administration (hereafter "HDA”) is a superagency of the City of New York, with responsibility for enforcement of housing standards set by State and local laws and regulations.
Defendant Community Housing Improvement Program, Inc. (hereafter "CHIP”) is a New York membership corporation composed of owners of real property in New York City. The other defendants are officers and members of CHIP’S board of directors, and owners of real property.

I

HDA commenced this proceeding to enjoin defendants from a planned shutdown of boilers for "maintenance” purposes, to take place December 5, 1974. A temporary restraining order was granted by this court and has been continued until this time. Defendants have agreed not to promote such a shutdown, and this court finds that the proposed action was organized by CHIP to dramatize certain housing issues not directly related to boiler maintenance. To protect the public, this court now grants HDA’s application for a permanent injunction.
A hearing on December 5 was adjourned to December 17, 1974, to afford CHIP the opportunity to raise related issues, and there have been a number of subsequent adjournments. Defendants answered on December 9 and pleaded two counterclaims. One counterclaim sought one million dollars for abuse of process. Plaintiff moved to dismiss this counterclaim or for a more definite statement. Plaintiff’s motion to dismiss that counterclaim is now granted.
The other counterclaim of that date sought 750 million dollars on the ground that HDA had engaged in conduct calculated to destroy property. HDA moved to dismiss that counterclaim, or for a more definite statement. This counterclaim was not pursued at the hearings, and HDA’s motion to dismiss is granted.
CHIP added a third counterclaim on December 17, 1974, and asked the court to order a "pass-along” of increased fuel costs to tenants in rent-controlled apartments. HDA again moved to dismiss. There was general agreement, and the court took judicial notice of the fact, that fuel costs had increased enormously in the previous 18 months and added a tremen *979 dous burden to already beleaguered property owners. However, the court believes that alleviation of that burden is primarily a legislative matter and now grants the motion to dismiss this counterclaim. It notes that a fuel cost "pass-along” was enacted as Local Law No. 27 of the Local Laws of 1975 of the City of New York, having been adopted by the city council on May 9, and approved by the Mayor on June 2, 1975.
After prior notice to all parties, the court utilized the provisions of subdivision (c) of section 110 of the New York City Civil Court Act and on January 28, 1975, ordered that hearings be held in search of "remedies, programs, procedures or sanctions authorized by law” which might better achieve compliance with required housing standards. HDA then brought a proceeding to prohibit and enjoin the court from holding such hearings (Joy v Klieger, Sup Ct, Kings County, Index No. 1658/75). An order to show cause was granted by Honorable Frank Composto on January 27, 1975. After a hearing, Honorable Irving P. Kartell ruled on February 5, 1975, that subdivision (c) of section 110 authorized the proposed utilization of subdivision (c) of section 110 of the Civil Court Act and denied HDA’s application.
Hearings were held, expert witnesses testified and were cross-examined, the court visited various buildings in the city and studied reports by governmental agencies and knowledgeable individuals. The court extends its thanks to the officials, professors, representatives of organizations, property owners, and others who came forward to assist the court in its deliberations, and to the attorneys for both parties who participated in the effort.
At the final argument on March 19, 1975, CHIP moved to conform the pleadings to the proof, to include the claim that the rent control and rent stabilization laws violated due process and equal protection provisions of the Constitutions of the United States and New York State. HDA opposed this motion.
Plaintiff will neither be harmed nor impeded by the granting of a motion to permit the defendants to plead the unconstitutional administration of the laws. Access to the courts is meaningless if constitutional issues are prohibited to parties by the recognition of highly technical objections. It is the policy of the courts to permit a party to amend his pleadings in good faith to raise and have determined all questions *980 affecting his rights (Miller v City of Philadelphia, 113 App Div 92; Washington Life Ins. Co. v Scott, 119 App Div 847).
The New York City Civil Court may entertain any defense to a cause of action or claim (CCA, § 905) including the defense of unconstitutionality of the act or ordinance under which plaintiff is proceeding (cf. Lincoln Bldg. Assoc. v Barr 1 Misc 2d 560, affd 1 NY 2d 413).
Various provisions of the applicable rent control and rent stabilization laws have already been held constitutional by the Court of Appeals (8200 Realty Corp. v Lindsay, 27 NY 2d 124; Matter of Hartley Holding Corp. v Gabel, 13 NY 2d 306; Plaza Mgt. Co. v City Rent Agency, 25 NY 2d 630) and this court will not consider those matters anew.
But administration of these laws is a separate matter.
The United States Supreme Court held in the case of Boddie v Connecticut (401 US 371, 379): "Our cases further establish that a statute or a rule may be held constitutionally invalid as applied when it operates to deprive an individual of a protected right although its general validity as a measure enacted in the legitimate exercise of state power is beyond question.” (Emphasis ours.)
Where a party claims that a statute is unconstitutional as applied, it is the function of the courts to grant him the opportunity to be heard. For, as Mr. Justice Douglas said, dissenting in part in Lindsey v Normet (405 US 56, 84): "due process entails the right 'to sue and defend in the courts,’ a right we have described as 'the alternative of force’ in an organized society.”
A party is deemed to have waived his right to have a statute declared unconstitutional unless the question is raised at the trial in some manner (Dodge v Cornelius, 168 NY 242). It may be raised by objection, motion, or exception, and certainly by answer (CPLR 3211; Massachusetts Nat. Bank v Shinn, 163 NY 360; People ex rel. Bush v Houghton, 182 NY 301).
Accordingly, the motion by defendants to conform the pleadings is granted, to the extent that the administration of the city’s rent control and rent stabilization laws will be considered.
It is clear that the existence at the same time of both a rent stabilization law and a rent control law creates confusion for tenants, landlords and public officials, and that these difficul *981 ties are confounded by the 1971 Vacancy Decontrol Law (L 1971, ch 371), the 1974 Emergency Tenant Protection Act (L 1974, ch 576), and many other laws. There is little to be said for confusion. Further, chaos in administering a law may make it unconstitutional.

II

Discussions of housing conditions and standards in New York City invariably lead to assertions that there is a "housing crisis”. Yet, the "crisis” is quite subjective. If the question is asked "Is there a housing crisis?” most people will answer affirmatively; but on any agenda of individual problems, or even New York City problems, housing seems to be far down the list. The mass media consider the "housing crisis” of the same genre as the "education crisis”, the "health crisis”, the "transportation crisis”, etc. It is worth noting that since the recent burgeoning of the city’s "fiscal crisis”, the media have devoted little time and space to the "housing crisis”.
To a large extent,' present shortages in housing units are the product of the increasing economically-forced abandonment of such units by landlords.
There was testimony that rental property is being abandoned at a rate exceeding 30,000 units a year, but the generally agreed-upon number by housing and planning agencies is 30,000. While cities without rent control may be suffering abandonments, it is clear however that in cities with rent control, housing units are being pushed over the brink and abandoned because of rent control. Housing units are now regressing from "stable,” to "deteriorating,” to "dilapidated,” to "vacant,” to "unsafe,” to "abandoned,” as a result of many factors, the most significant of which is rent control.
Nonpayment of real estate taxes has created several problems. One of these is the loss of badly-needed revenue to the city, with total arrears now estimated at almost 600 million dollars, and that does not include arrears in water rents and sewer rents. In almost all such cases, revenue from a building is simply not enough to encompass the required payments, and property owners can not pay taxes.
Further, there is a rent gap of some $750,000,000 a year created by the MBR (Maximum Base Rent) "system” as administered.
The rent gap is the difference between what landlords *982 actually collect in rents and what is needed to maintain housing units.
This rent gap makes it impossible for landlords to comply with building codes or to pay for the labor for proper maintenance among other things.
The evidence has convinced the court that rent control had a different impact on building owners from 1943 to 1965, from that in the period since 1965. In the earlier years, owners were able to cut some services and maintenance. They had few vacancies. Inflation and interest rates were moderate. But by the 1960’s, no services were left to cut, and code compliance was more strictly enforced. All expenses since 1965 have increased far more rapidly, traumatically compounded by the increase in fuel costs from 6 cents a gallon to 35 cents a gallon in 1973-1974. The MBR system cannot digest such increased costs, and the irony may be that an MBR-type system may fail in the 1970’s, whereas it probably could have worked in the 1960’s. By using the word "worked”, the court means that a system of gradual, moderate, rent increases in the 1960’s might have helped much real estate; not that the kind of MBR system we have could have been administered better then than now.

Ill

A discussion of traditional rent control, now embodied in the MBR system, must start with the period before 1970, when it was generally assumed that 1.2 million housing units were covered by traditional rent control. Some units were decontrolled by the 1970 MBR law enacted by the city council, others by procedures in the traditional rent control law (e.g., for new construction), and many more by the vacancy decontrol and primary residence laws (L 1971, ch 373) enacted by the State Legislature in 1971. At present, estimated units under MBR are about 850,000 but the city Department of Rent and Housing Maintenance still keeps reports on all units that were formerly under rent control, even units in two-family houses that were decontrolled 20 years ago. Thus, the record-keeping task itself is an enormous burden.
After New York City was given authority over rent control in 1962, it enacted a basic rent control law and made adjust-merits periodically, by local law or regulation, as situations changed or new problems emerged. Yet, with all the changes, *983 the system could be administered, not least because most tenants and most landlords could compute what the rent should be, and what increases were appropriate, for a new tenancy or a capital improvement. Requests for hardship increases were being processed, as were requests for rent reductions because of reduced services.
After a series of consultant and task force studies reached the conclusion that rentals had to be increased to protect the economic life of the city’s housing, the city administration did not suggest an easy-to-administer program of periodic moderate increases. It attempted to demonstrate that "the brightest and the best” statisticians, economists and "urbanologists” could develop a system that would do the job and be fair to everyone. It was assumed that such a complicated system could in fact be administered. The MBR law was enacted by the city council in 1970.
Alexander Pope’s apt description of what happened next is found in the Dunciad: "Then rose the seed of Chaos, and of night to blot out order and extinguish light”. After a year-long study of the implementation of the MBR system by the New York State (Scott) Commission to Make a Study of the Governmental Operations of New York City, its executive director concluded that the MBR system was an "administrative disaster”, and issued a major report cataloging the failures in implementation. This court has heard testimony about the MBR system. In general, no one seems to be happy with it. The city council tried to repeal it in 1973. The most common criticisms of how MBR operates are as follows:
1. The system contemplated increases tied to moderate cost increases of the 1950’s and early 1960’s. It does not and cannot reflect the rapid cost increases of the late 1960’s and 1970’s.
2. In an attempt to enact the 1970 legislation, people who should have known better overpromised the benefits the law would bring to landlords and tenants. When the benefits did not materialize, the subsequent reaction made it less likely for MBR to work.
3. The MBR system might have worked if it had been established as a totally new system with two years for implementation. It could not be implemented on top of an existing system by employees who had to administer an existing law.
4. The MBR system could never have worked because it was too complicated.
*984 5. Everyone assumed that the "technology” (in the broadest sense) was available. In fact, we do not have the technology to work such a complicated system for so many units, within present budgetary parameters.
6. The implementation of MBR was sabotaged by officials in HD A, either by misfeasance or by nonfeasance.
7. The MBR system has never worked, is not working, and can never be made to work.
8. The MBR system is so nonfunctioning that the courts have to replace it periodically by ordering interim across-the-board rent increases. If this pattern, having existed for five years, will be continued in the future, then we do not need MBR — and it should be replaced by a simpler system for annual increases.
9. Except in special cases, tenant requests for rent reductions for improper landlord behavior or reduced services are not processed in timely fashion.
10. Except in special cases, tenant requests to stop rent increases because of landlord failure to comply with housing codes or to provide essential services, are not processed in a timely manner.
11. Except in rare cases, property owner requests for hardship increases, capital improvements, protests, rent determinations, etc., are not processed in a timely manner.
12. Neither landlords nor tenants can get information in a timely manner as to what the rent for any apartment was, is or will be in the future under MBR.
13. While some people will defend what the MBR system was supposed to do, no one at the present time will defend the existing system.
Moreover, the Administrator of Housing and Development Administration of the City of New York, the agency charged with administering the MBR system, testified that administering the MBR presented "a very, very, odious administrative problem.” (Starr testimony at hearing.)
The MBR law, as a "system” of regulating rents and housing has been upheld, as was the earlier rent control law. Part of this regulatory system was the potential for additional increases in certain situations. An examination of the administration of this law, however, shows an overly-complicated system of regulation.
The testimony and exhibits at the trial established without *985 contradiction or dissent that the administration of these laws has resulted in wholesale deprivation of property without due process of law, as well as denial of equal protection.
The utter collapse in the administration of these laws has made such procedures to protect property rights of both landlords and tenants as hardship applications and MBR protests a mockery. Literally years of delay and total inaction in processing remedial applications under the laws has become the rule rather than the exception. A rent gap approximating 750 million dollars has led to a deterioration in housing units, and enforced total abandonment of valuable property on an unprecedented scale. There have not been funds to correct violations. The City of New York is out some 600 million dollars in defaulted real estate taxes at a moment in its financial situation when every dollar is needed. The defendants and those similarly situated have been deprived of property without remedies that constitute the essence of due process and equal protection. Tenants have suffered inconvenience and hardship in many instances. A line of decisions from courts at all levels has indicated growing impatience and concern.
Under all of these circumstances, the conclusion is inescapable that laws that were constitutional ab initio have now become unconstitutional in their administration. (Boddie v Connecticut, 401 US 371, supra.) An enlightening analogy is to be found in two decisions of our Court of Appeals regarding the constitutionality of a condemnation law. In the first decision the Court of Appeals reversed an Appellate Division holding that a law providing for condemnation of some of the surface transportation lines was unconstitutional. The Court of Appeals held it to be constitutional. The matter reached the Court of Appeals again some years later when the city had failed to make certain payments to the condemnee. At that point, the Court of Appeals warned that although it had originally upheld the constitutionality of the taking, the city’s subsequent conduct in administering the ancillary protections to the condemnee was "verging” on making what had been constitutional on its face, unconstitutional as a result of its subsequent administration. (Matter of City of New York [Fifth Ave. Coach Lines], 18 NY2d 741.) And so here, we face a situation where laws originally constitutional have collapsed in follow through to the point that due process can no longer be said to exist. It is incongruous that rent control laws that *986 were enacted as necessary to cope with a housing crisis, have now in large measure become responsible for the exacerbation of the crisis they were designed to correct.
In summary, the tactic of boiler shutdowns resorted to by defendants to dramatize their problems is legally impermissible and a potential threat to tenants’ welfare, and such conduct is permanently enjoined. The plaintiff’s motions to dismiss various of the counterclaims are granted in accordance with this opinion. Defendants’ motion to amend to conform to the proof and thus raise the constitutional questions dealt with herein is granted. The laws recounted which underlie the systems of rent control are found to have become unconstitutional as administered, and are declared to be unconstitutional.
Under the circumstances, this court may grant any type of relief within the broad jurisdiction conferred upon it by subdivision (c) of section 110 of the Civil Court Act appropriate to the proof that the aforesaid statutes are unconstitutional. However, the implementation of this decision insofar as it declares said laws to be unconstitutional will be stayed for a period of 60 days to afford an opportunity to plaintiff and other appropriate authorities to present a plan for administering said laws so as to cure the constitutional defects outlined herein.