Froessel, J.
This appeal is taken directly to us under subdivision 4 of section 588 of the Civil Practice Act from three orders of the Municipal Court of the City of New York, Borough of Manhattan, Ninth District. It presents for our consideration the constitutionality of the 1955 re-enactment of the Business Rent Law (L. 1955, ch. 701) insofar as it affects office space only. Unconstitutionality is claimed by appellants under the due *415 process and equal protection clauses (U. S. Const., 14th Amdt.; N. Y. Const., art. I, §§ 6, 11); the contract clause of the United States Constitution (art. I, § 10), and our own constitutional provision prohibiting the taking of private property without just compensation (N. Y. Const., art. I, § 7), on the ground that the emergency originally justifying the law has now come to an end.
The law is clear. The principles by which to test the constitutionality of a statute resting on the police power have been asserted over and over again: A legislative enactment carries with it a strong presumption of constitutionality, i.e., it is presumed to be supported by facts known to the Legislature (United States v. Carolene Products Co., 304 U. S. 144, 152; South Carolina Highway Dept. v. Barnwell Bros., 303 U. S. 177, 191; Carmichael v. Southern Coal Co., 301 U. S. 495, 509-510; Defiance Milk Products Co. v. Du Mond, 309 N. Y. 537, 540-541; East New York Sav. Bank v. Hahn, 293 N. Y. 622, 627-628, affd. 326 U. S. 230). This presumption, however, is not irrebuttable (Defiance Milk Products Co. v. Du Mond, supra, p. 541), and courts may scrutinize the basis of legislative enactments predicated upon the existence of a particular state of facts (United States v. Carolene Products Co., supra, p. 153; Chastleton Corp. v. Sinclair, 264 U. S. 543); but they may not be concerned with questions as to the ‘1 reasonableness, wisdom and propriety ’ ’ (South Carolina Highway Dept. v. Barnwell Bros., supra, p, 191; Day-Brite Lighting v. Missouri, 342 U. S. 421, 423; Defiance Milk Products Co. v. Du Mond, supra, p. 541; Thompson v. Wallin, 301 N. Y. 476, 488, appeal dismissed 342 U. S. 801; Matter of Stubbe v. Adamson, 220 N. Y. 459, 469; People v. Griswold, 213 N. Y. 92, 97), expediency (Thompson v. Wallin, supra; Carmichael v. Southern Coal Co., supra, p. 515) or “desirability” thereof (Daniel v. Family Ins. Co., 336 U. S. 220, 224), and “ Where the question of what the facts establish is a fairly-debatable one, we accept and carry into effect the opinion of the legislature ” (Old Dearborn Co. v. Seagram Corp., 299 U. S. 183, 196; Matter of Stubbe v. Adamson, supra). Nor may courts substitute their judgment for that of the Legislature so long as there can be discovered “ any state of facts either known or which could reasonably be assumed ” to afford support for the legislative decision to act (United States v. *416 Carolene Products Co., supra, p. 154; East New York Sav. Bank v. Hahn, 326 U. S. 230, 234, supra; South Carolina Highway Dept. v. Barnwell Bros., supra, p. 191; Borden's Co. v. Ten Eyck, 297 U. S. 251, 263). Applying these tests to the case at bar, we are of the opinion that the so-called office rent control law is clearly constitutional, and may not be invalidated by these proceedings.
Historically, emergency business space controls had their genesis in chapter 314 of the Laws of 1945. As the preamble to that enactment pointed out, the nation was then engaged in World War II. War production, the production and distribution of essential civilian commodities, the rendition of essential services, professional and otherwise, priorities, rationing and other civilian controls to check inflation were the necessary order of things. Another aspect of the national effort to minimize the ravages of an inflationary economy was the control of rentals. The cessation of nonessential civilian construction of housing, business and commercial space was aggravated by increasing demands for such space. Out of this had arisen a condition where, as landlord itself describes it, ‘ ‘ business tenants found themselves in a hopeless bargaining position vis-a-vis their landlords ” (see N. Y. Legis. Doc., 1945, No. 2, pp. 11-17; N. Y. Legis. Doc., 1945, No. 31, pp. 9-10). The act was “ declared to be a measure designed to protect and promote the public health, safety and general welfare, to aid the successful prosecution of the war, and essential civilian activities, and to conserve manpower, essential materials and transportation facilities, and to prevent inflation, and is made necessary by an existing emergency.” (L. 1945, ch. 314, § 1.) We held the Business Rent Law constitutional in Matter of Court Square Bldg. v. City of New York (298 N. Y. 380). The Commercial Rent Law was similarly upheld in Twentieth Century Associates v. Waldman (294 N. Y. 571).
The rent laws were thereafter annually re-enacted, although with relaxing modifications from time to time. Without here narrating in detail the early history of and the subsequent amendments to office rent control laws, it may merely be noted that there is no real issue here as to the continuance of the emergency during the period following the close of World War II, and during the more recent warfare in Korea from 1950 to the summer of 1953.
*417 In 1948, prior to the Korean conflict, the Temporary State Commission was created “ to survey and appraise ” the rent laws, and “ to inquire into the need for amending and the gradual discontinuing of such laws ” (L. 1948, ch. 675). As a result of its studies then and during the following years, and as the emergency lessened in intensity, the commission recommended numerous amendments relating to various aspects of the rent laws to allow landlords increased rentals, greater freedom in recovering possession, and various types of other relief (as, e.g., see Business Bent Law, § 2, subd. [e] [allowing rent increases up to 30% over the June 1, 1944 rental]; § 4 [allowing adjustment of rent to provide an 8% return on the fair value of the property] ; § 8 [allowing recovery of the property by landlord in a number of specific instances]). New construction has not been controlled since the enactment of section 14 by chapter 273 of the Laws of 1946, and vacated space became decontrolled since the enactment of section 12 by chapter 326 of the Laws of 1950.
In line with its work, the commission continued—and continues— to study and recommend. In 1955, the year in which the challenged statute was enacted, it conducted a public hearing on the extension of controls. Both tenants and landlords were represented — the latter arguing that the controls should be abolished or relaxed, the tenants that they should continue. The commission, however, subsequently concluded only that, “ Notwithstanding constantly increasing new rental space and an increasing number of vacancies, particularly in stores, the Commission determined that although lessened in severity, the emergency continues to an extent which justifies the continuance of the emergency laws for another year. The extension of these laAvs, however, is relaxed somewhat in a manner which ultimately will provide gradual decontrol.” (N. T. Legis. Doc., 1955, No. 73, p. 15; emphasis supplied.)
With this the Legislature agreed, and chapter 701 of the Laws of 1955 was passed unanimously in both houses and signed by the Governor effective July 1, 1955. This is the particular extension of the statute here under attack—although the act was, after a further hearing on February 10, 1956, again extended until July 1, 1957 by chapter 735 of the Laws of 1956.
The question thus posed is whether there existed in 1955 a reasonable basis for findings justifying continuance of rent *418 controls upon office space. In other words, was the legislative choice without rational basis? (South Carolina Highway Dept. v. Barnwell Bros., 303 U. S. 177, 191-192, supra.)
The landlord, recognizing its heavy burden in overcoming the strong presumption of constitutionality, has adduced a large quantity of evidence which it claims demonstrates ‘ ‘ beyond any doubt ” that, while the statute as originally passed in 1945 was valid, it ‘ ‘ has ceased to be constitutional because there is no longer any emergency of any kind which sustains it ” (emphasis supplied). Whereas the law is clear, the same may not be said about the evidence before us. Nor may we leave wholly out of consideration “ the pooled general knowledge ” of the legislators themselves (East New York Sav. Bank v. Hahn, 326 U. S. 230, 234, supra).
While it is true that most of the proof in the case was presented by the landlord, that evidence bore many earmarks of conflict within itself. A great deal of it related to miscellaneous data gathered from various sources with respect to numerous office buildings, and more particularly with regard to vacancies, vacancy turnovers, increased and decreased rentals, alterations, improvements and renovations, alleged inducements to tenants, the employment of brokers, and the like — as to all of which legitimate argument as to its impact upon the critical issue has been ably made both ways.
The landlord urged that a substantial increase in office building space afforded a fluidity of movement which placed tenants in a reasonable bargaining position. On the other hand, the Attorney-General, who was permitted to appear in these proceedings pursuant to section 71 of the Executive Law, maintained that builders and others have been prompted to invest many millions of dollars in new construction because of general recognition that an acute shortage of office space, evidencing the continuance of the emergency, still exists — they were not gambling on vacancies.
As to the general ratio of actual vacancies in existing office buildings to the total office space in such buildings, the Attorney-General makes a strong argument from the landlord’s own evidence and surveys that the figure was well below what may be considered normal, and among other things points to the graph in an exhibit prepared by the research department of the Eeal Estate Board of New York. Inc., showing the annual average of *419 so-called above-grade vacancies for the years 1925-1955. It showed that in 1955 the ratio of vacancies was 1.2%—lower even than in 1950 when the ratio was 1.6% —and substantially less than in 11 major cities of the United States where, according to the evidence, the ratios ranged between 3.11% and 10.92%.
He also points out that the July 22,1955 issue of Real Estate Analyst observed that new space was having ‘6 negligible effect on the vacancy rental ”, and that the February, 1955 issue of Real Estate Forum, commenting on “ New York’s unchallenged position as the world’s financial, commercial and business administrative capital ’ ’, noted that although new buildings were being constructed and leased, they had not produced “ any noticeable dent in the occupancy ratio of existing structures ”, and that nothing like it has happened or is likely to happen anywhere — with both of which statements Mr. Helmsley, the landlord’s principal witness and one of its partners, agreed.
As to so-called “ fringe buildings ”, it was shown that even at the height of the postwar emergency some of such structures were not fully rented, one of them having a 25% vacancy ratio in 1944 during the critical period of the war and but 8% or 9% at the time of the trial. The landlord, recognizing the force of the evidence as to the comparatively small percentage of vacancies, takes refuge in the position that ‘ ‘ a vacancy statistic is meaningless ’ ’.
The evidence below followed the general pattern of that presented to the temporary commission at its afore-mentioned 1955 hearing preliminary to the re-enactment in question. "While some of the witnesses at that earlier hearing, representing the interests of landlords, suggested immediate cessation of controls, they also recommended, in the alternative, gradual decontrol.
The tenants, on the other hand, urged the commission to maintain controls. Individual representatives concerned themselves with the anticipated sharp rise in rentals in the event that controls were lifted, and with the effect this would have through increased costs and prices and through forced migration of tenants from the city.
At most, then, landlord representatives by their own evidence at both this trial and before the legislative commission did no more than raise a conflict of testimony and opinion—a debatable question as to the existence of an emergency and the need *420 for rent control as to office space. But the resolution of that question was properly for the Legislature, and no court may substitute therefor its own evaluation of the weight of such conflicting proof (United States v. Carolene Products Co., 304 U. S. 144, 154, supra).
The legislative commission had been functioning continuously since 1948 and had kept itself informed as to current conditions, recommending relaxation in the law from time to time. As to landlord’s complaint that the commission did not make a more detailed survey prior to its recommendation in 1955, we need simply note that the Supreme Court, in Carmichael v. Southern Coal Co. (301 U. S. 495, 510, supra) said: “ A state legislature, in the enactment of laws, has the widest possible latitude within the limits of the Constitution. In the nature of the case it cannot record a complete catalogue of the considerations which move its members to enact laws. In the absence of such a record courts cannot assume that its action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is to be applied, it was not aware of facts which afford reasonable basis for its action. Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.” (See, also, Farrington v. Pinckney, 1 N Y 2d 74, 88; East New York Sav. Bank v. Hahn, 326 U. S. 230, 234, supra.)
The disposition of this appeal, we might add, is dependent upon the existence of facts justifying the 1955 extension of the law under review. In no way is it determinative of the constitutionality of office space controls in any later year. Bent controls, all will agree, ought not achieve a status of permanence in our economy. They have no justification except in periods of emergency (see Twentieth Century Associates v. Waldman, 294 N. Y. 571, 582, supra; Matter of People [Title & Mtge. Guar. Co.], 264 N. Y. 69, 94, 95-96). Here, however, there is a rational basis for the legislative finding. Whether and for how long the Legislature may lawfully continue office rent control must, and shall, be a question open for future review.
The orders appealed from should be affirmed.