Cooke, J.
(dissenting). The New York City Emergency Moratorium Act of 1975, is, I submit, constitutional. Previously, the Appellate Division unanimously, and Special Term before it, found it constitutional. A declaration of unconstitutionality at this juncture departs from moratorium principles *743 established through the years by the highest courts of our State and Nation and overlooks certain specific constitutional provisions, all of which mandate a finding of constitutionality.
I
The declaration of a law as unconstitutional is a delicate task, to be entered upon only with reluctance and hesitation (see People v Beakes Dairy Co., 222 NY 416, 426; 1 Cooley, Constitutional Limitations [8th ed], p 334). The postulate of constitutional adjudication is that every enactment of the Legislature is clothed with an exceedingly strong presumption of constitutionality (I. L. F. Y. Co. v Temporary State Housing Rent Comm., 10 NY2d 263, 269; see New York v O’Neill, 359 US 1, 6). While the presumption is rebuttable, unconstitutionality must be demonstrated beyond a reasonable doubt and, only as a last resort, will courts strike down statutes on such a ground (Wiggins v Town of Somers, 4 NY2d 215, 218-219; Defiance Milk Prods. Co. v Du Mond, 309 NY 537, 541). The thrust of examination should be in the direction of validity, not invalidity, since a legislative act must be construed, if fairly possible, so as to avoid the conclusion that it is unconstitutional (United States v Jin Fuey Moy, 241 US 394, 401; Saltser & Weinsier v McGoldrick, 295 NY 499, 509). Thus tested, it just cannot be said that the Emergency Moratorium Act is unconstitutional, much less unconstitutional beyond a reasonable doubt.
If any state of facts, known or to be assumed, justify the law, this court’s power of inquiry ends (Defiance Milk Prods. Co. v Du Mond, supra; United States v Carolene Prods. Co., 304 US 144, 154).
II
Meeting in Extraordinary Session in September of 1975, the Legislature passed the New York State Financial Emergency Act for the City of New York (L 1975, chs 868, 869, 870). The Legislature expressly found that "a financial emergency * * * exists in the city of New York. The city is unable to obtain the funds needed by the city to continue to provide essential services to its inhabitants or to meet its obligations to the holders * * * These events [nonpayments to unpaid employees, vendors and suppliers, recipients of public assistance and city obligations] would effectively force the city to stop *744 operating as a viable governmental entity and create a clear and present danger to the health, safety and welfare of its inhabitants * * * If the city were unable, because of the lack of funds, to function in its normal manner, the economy of the state would, therefore, be drastically harmed * * * This situation is a disaster and creates a state of emergency” (L 1975, ch 868, § 1).
The emergency act was not enough to overcome New York City’s financial problems and in November of 1975, again in Extraordinary Session, the Legislature enacted the New York State Emergency Moratorium Act for the City of New York (L 1975, ch 874, as amd by ch 875). This time, the Legislature found "that the grave public emergency found and declared to exist by the legislature in adopting the New York State Financial Emergency Act for the City of New York has dramatically worsened in the last two months * * * There is * * * an imminent danger that the city of New York will be unable to pay its outstanding short-term indebtedness and even to provide those basic services essential to the health, safety and welfare of its inhibitants and the continuation of orderly government in the city” (L 1975, ch 874, § 1). The Legislature’s express purpose in enacting the Emergency Moratorium Act was "to ameliorate the disastrous consequences, to taxpayers, to holders of short-term obligations and to city residents, of an inability by the city to meet its financial and governmental responsibilities in full * * * [and] to avoid undue disruption of the process of financial recovery already underway, so as to facilitate restoration of the city’s financial integrity and the payment of all its obligations” (L 1975, ch 874, § 1).
The existence of these facts supporting the legislative judgment—the "grave public emergency * * * [which] has dramatically worsenéd” and the "imminent danger that the city of New York will be unable * * * even to provide those basic services essential to the health, safety and welfare of its inhabitants and the continuation of orderly government in the city”—is presumed, although subject to rebuttal (United States v Carolene Prods. Co., 304 US 144, 152, supra; Lincoln Bldg. Assoc. v Barr, 1 NY2d 413, 415). Upon judicial inquiry, legislative findings as to a "public emergency” are entitled to "great weight” (East N. Y. Sav. Bank v Hahn, 293 NY 622, 627, affd 326 US 230; see Block v Hirsh, 256 US 135, 154-155). Such diverse persons and units as the President of the United *745 States, the Congress, the Governor, the Legislature, the New York City Council and the Mayor of the City of New York, representing different political affiliations and governmental strata, by their official acts, have all recognized the reality and depth of the financial distress of the City of New York. Indeed, the majority speaks of the (p 733) "city’s desperate fiscal paralysis” and appellant has failed to demonstrate, or even state outright, that there is no emergency. Even where the question of what the facts establish is fairly debatable, far from this situation, we accept and carry into effect the findings of the Legislature (Old Dearborn Co. v Seagram Corp., 299 US 183, 196; Lincoln Bldg. Assoc. v Barr, supra).
Ill
The reversal by the majority and its holding of unconstitutionality as to the Emergency Moratorium Act is said to be "key[ed]” to the State Constitution provision that a city may not contract indebtedness unless it has pledged its "faith and credit” for the payment of the principal and interest of the indebtedness. It is asserted that the Emergency Moratorium Act, by depriving short-term noteholders of judicial remedies for at least three years, makes meaningless the verbal pledge of faith and credit. Purportedly, "Federal questions” need not be reached.
Section 2 of article VIII of the State Constitution, in pertinent part, reads: "No indebtedness shall be contracted by any * * * city * * * unless such * * * city * * * shall have pledged its faith and credit for the payment of the principal thereof and the interest thereon.” (Emphasis added). As its language specifies, this provision prohibits the city from "contracting]” indebtedness without pledging its "faith and credit” for payment. There is no question but that the city did,'in fact, make such pledge when it issued the notes to appellant, the Flushing National Bank, as well as to others. That fact is not denied and, indeed, appellant’s brief and the exhibits submitted by it evidence the pledge. Thus, there was initial compliance by the city with this constitutional requirement. But the majority, disregarding the settled interpretation of "faith and credit”, goes beyond the "indebtedness” which has been "contracted” and the pledge of "faith and credit”. It holds that, by such a pledge, the city is (p 736) "constitutionally obliged to pay and to use in good faith its revenue powers to produce funds to pay the principal of the notes when due.” *746 Thus, under such a view, the performance of the contract is also a matter of constitutional dimension and, therefore, in effect, in no situation whatever arising subsequent to the making of the required pledge, by legislation or otherwise, might the city be relieved of precise performance.
A faith and credit pledge simply means that the issuing government agrees to be generally obligated to pay the indebtedness out of all the government’s revenues, rather than restrictively obligated only from specific revenues; it expresses an undertaking by the government to be irrevocably obligated in good faith to use such of its resources and taxing power as may be authorized or required by law for the full and prompt payment of the obligation according to its terms. In State v City of Lakeland (154 Fla 137), where bonds pledged either the "full faith, funds, property, credit and resources” or the "full faith, credit and resources” of the City of Lakeland, the Supreme Court of Florida declared at page 139: "We cannot agree that 'surplus net revenues’ of the light and water system of the municipality have ever been 'pledged’ to the payment of the debt, in the sense that the City now uses the word. In our view the pledge contained in the original obligations no more constitutes an express pledge of surplus light and water revenues, in the legal sense of the term, than it does of surplus funds derived from other municipal functions, either proprietary or governmental. In fact, such pledge does not create a specific lien on any particular property. It does no more, in legal effect, than express an undertaking by the City to be irrevocably obligated, in good faith, to use such of its resources and taxing power as may be authorized or required by law for the full and prompt payment of the principal and interest of the obligation as it becomes due under its terms.” (Emphasis added.) Likewise, in Sacramento Municipal Utility Dist. v Spink (145 Cal App 2d 568, 576, 577), where bonds contained a covenant that "[t]he full faith and credit of said District are hereby pledged for the punctual payment of the principal and interest of this bond,” a California District Court of Appeals "agree[d] with the interpretation of the Florida court [in City of Lakeland] and [held] that such a covenant does not pledge the revenues.”
A correct analysis in respect to a "faith and credit” pledge was made by our own Court of Appeals in Matter of Tierney v Cohen (268 NY 464). There, a local law attempted to establish an authority to construct and operate a plant to supply *747 electricity to consumers in the City of New York, to be financed by bonds of the authority as to which the credit of the city was not to be pledged (pp 470-471). The court declared the local law to be in violation of the then subdivision 5 of section 20 of the General City Law which read in part: "but, notwithstanding the provisions of any general, special or local law or ordinance a city shall have no power to issue obligations to which it has not pledged its faith and credit for payment of the principal and interest thereof.” It was held at pages 472-473: "To decide otherwise would change the whole system of municipal financing and auhorize the city to build an electric lighting plant from the proceeds of bonds issued by an 'authority’ upon its own credit and not upon the credit of the city itself in direct violation of section 20, subdivision 5, of the General City Law”. (See, also, 11 Opns St Comp, 1955, p 25; 3 Opns St Comp, 1947, p 528.)
The faith and credit pledge in the notes in question was but a single term of the contract, an undertaking in an agreement which created obligations contractual in nature (cf. Swift & Co. v Bankers Trust Co., 280 NY 135, 142). When municipal notes or other obligations contain such a term and the municipality breaches its contractual obligation, such as by failing to take proper action in order that funds be made available to meet the obligations when due, the breach gives rise to an action for breach of contract (Snell v City of Long Beach, 27 NYS2d 164, affd 263 App Div 1021, affd.290 NY 649).
The faith and credit pledge, as the words imply, requires no more than that the city make a good faith effort to use its resources, credit and powers to pay its indebtedness. This effort must be measured in the light of the city’s over-all financial condition and its over-all obligations to its citizens and others. Parenthetically, the record, presented on return of the motion for summary judgment in December of 1975, presents a strong showing in this respect. An intensive and sustained effort has been made by those managing the city’s affairs to restore its financial credit. Every step exhibits the city’s good faith.
Some items are worthy of mention. In December, 1974, the Mayor directed a hiring freeze (Executive Order No. 24) so that between December 31, 1974 and July 31, 1975 there was a net reduction of about 18,500 full-time city employees, through layoffs or attrition, reducing the city’s annual expenditure by an estimated $265 million. A "crisis budget” was *748 adopted, for the fiscal year commencing July 1, 1975. The real estate tax for fiscal 1975-1976 was increased 11% over the prior year. In July, 1975 additional taxes, expected to yield about $325 million, were imposed. On June 10, 1975, the Legislature enacted the New York State Municipal Assistance Corporation Act (L 1975, ch 168) and created the Municipal Assistance Corporation for the City of New York (L 1975, ch 169), which corporation, by the sale of bonds to the public, underwriters, the 11 New York clearing house banks and the city and State pension funds, provided the city with a total of about $1.9 billion through September 5, 1975. In August, 1975, the city enacted Local Law No. 43 providing for a wage freeze effective for the first pay period ending on or subsequent to September 1, 1975. In September, 1975, the Legislature enacted the New York State Financial Emergency Act for the City of New York (L 1975, chs 868-870). Pursuant thereto, the city, with the approval of the Emergency Financial Control Board, adopted a three-year financial plan to balance the budget in fiscal 1977-1978 reducing the annual expenditure rate by an additional $724 million. To effect a reduction of $200 million in fiscal 1975-1976, the Mayor directed all city agencies to reduce their expenditure rates by an additional 8% during the remainder of said year, except for police, fire, correction and sanitation departments for which an additional 3% was directed and the New York City Health and Hospitals Corporation, the Board of Education and the Board of Higher Education for which an additional 4Vi% was ordered. As of October 31, 1975, the city’s full-time employees had been reduced by 35,887 persons, resulting in annual personnel cost savings of approximately $510 million. The hiring freeze continued, it having been estimated that an additional 13,000 would leave the city’s employ by June 30, 1976. The city halted all new construction and suspended work on 46 city-funded construction projects then underway. Eight fire companies were disbanded and seven schools and a municipal hospital were closed. Extensive efforts were made to obtain Federal assistance.
IV
In any event, the insertion of the faith and credit pledge into the contract could not possibly, nor did it purport to, immunize or insulate the entire contract, or even a part of it, from a valid exercise of the police power by the State. The *749 authority of the Legislature, in the exercise of its police power, may not be limited or restricted by stipulations in private contracts or in those between private parties and governmental units or agencies, since the police power is incapable of alienation by the parties (Buffalo East Side R. R. Co. v Buffalo St. R. R. Co., 111 NY 132, 140; People ex rel. City of Geneva v Geneva, Waterloo, Seneca Falls & Cayuga Lake Traction Co., 112 App Div 581, 586, affd 186 NY 516; 9 NY Jur, Constitutional Law, § 167, pp 71-72; cf. City of New York v Second Ave. R. R. Co., 32 NY 261, 271; Brick Presbyt. Church v City of New York, 5 Cow 538, 540; 1 Cooley, Constitutional Limitations [8th ed], pp 436-437 [to the effect that the city has no power as a party to make a contract which would control the legislative powers of the Legislature]).
The Emergency Moratorium Act establishes a three-year moratorium on enforcement of outstanding short-term obligations* of the city, specifically "to avoid destructive actions during the time the city requires to regain its financial health.” (L 1975, ch 874, § 1.) It provides that, during the "moratorium period”, the enforcement of judgments and liens based upon any short-term obligations of the city, as well as the commencement or continuation of any actions upon such short-term obligations, shall be suspended, even though payment of such short-term obligations may be due according to their terms.
The majority’s declaration of unconstitutionality, carried to its logical conclusion, simply means that there can be no moratorium laws affecting contracts containing a faith and credit pledge. This position not only disregards New York City’s grave public emergency but is contrary to the long line of decisions by this court and the United States Supreme Court which recognize that every contract, public or private, includes an implied condition, as much a part of the contract as though written into it, by which there is implicitly reserved to the State the essential attributes of sovereign power to secure the health, safety and welfare of its people, notwithstanding interference with contracts.
Any notion, such as espoused by appellant Flushing, that the contract impairment clause of the United States Constitution (art I, § 10) is an absolute bar to State action with respect *750 to contracts was conclusively laid to rest over 40 years ago by the United States Supreme Court in Home Bldg. & Loan Assn. v Blaisdell (290 US 398, 447). We should not now proceed in the opposite direction, using as a vehicle the Federal Constitution or even, as attempted here, section 2 of article VIII of the State Constitution. In Blaisdell, the validity of the Minnesota Mortgage Moratorium Law was challenged as being repugnant to the contract clause. That law, like the Emergency Moratorium Act, was enacted because of an "economic emergency” (the depression of the 1930’s) which threatened the "vital interests of the community” (290 US, at p 444). There, the Minnesota Moratorium Law, in some ways similar to the act here, authorized the suspension of the right of a mortgagee (a creditor) to collect the principal of the debt either by seeking foreclosure or bringing an action for a deficiency judgment for a period up to two years. The United States Supreme Court, in upholding the Minnesota Moratorium Law, outlined the relationship between the State’s police power and the contract clause in terms which should govern the disposition here. It was recognized that "[wjhile emergency does not create power, emergency may furnish the occasion for the exercise of power” (290 US, at p 426). It was then declared (pp 434-435): "Not only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.’ Stephenson v. Binford, 287 U. S. 251, 276. Not only are existing laws read into contracts in order to ñx obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,—a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.” (Emphasis added.) The Supreme Court went on to state that (p 437) "[t]he economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts” and, in such instances, that (p 438) "[t]he question is not whether the *751 legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end”.
In 1933, also during the depression then prevalent, the State of New York enacted a mortgage moratorium law (L 1933, ch 793) to meet conditions which had arisen in the mortgage field due to financial stringency, it having been declared that there existed "a serious public emergency, affecting and threatening the welfare, comfort and safety of the people of the state.” The effect of this statute was to suspend foreclosure of mortgages and legal action to recover the underlying indebtedness by holders of mortgages for nonpayment of principal. The constitutionality of this legislation was upheld unanimously by this court (Klinke v Samuels, 264 NY 144 [1934]).
Year by year the 1933 statute was renewed for another year, except in 1941 when a two-year extension was made. When the 1937 re-enactment was challenged, this court again upheld the legislation (Maguire & Co. v Lent & Lent, 277 NY 694 [1938]). Chapter 93 of the Laws of 1943 called for an extension to July 1, 1944, it being also provided that the owner of the mortgaged premises, in order to be entitled to the benefit of suspension of foreclosure, would have to amortize the principal at the rate of 1% per annum. Once more, when questioned, the legislative act was found to be constitutional by this court (East N. Y. Sav. Bank v Hahn, 293 NY 622 [1944], supra). The Hahn case found its way to the United States Supreme Court (326 US 230, 232-233 [1945]), which declared: "The Blaisdell case and decisions rendered since (e.g., Honeyman v. Jacobs, 306 U. S. 539; Veix v. Sixth Ward Assn., 310 U. S. 32; Gelfert v. National City Bank, 313 U. S. 221; Faitoute Co. v. Asbury Park, 316 U. S. 502), yield this governing constitutional principle: when a widely diffused public interest has become enmeshed in a network of multitudinous private arrangements, the authority of the State 'to safeguard the vital interests of its people,’ 290 U. S. at 434, is not to be gainsaid by abstracting one such arrangement from its public context and treating it as though it were an isolated private contract constitutionally immune from impairment.
"The formal mode of reasoning by means of which this 'protective power of the State,’ 290 U. S. at 440, is acknowledged is of little moment. It may be treated as an implied *752 condition of every contract and, as such, as much part of the contract as though it were written into it, whereby the State’s exercise of its power enforces, and does not impair, a contract. A more candid statement is to recognize, as was said in Manigault v. Springs, supra, that the power 'which in its various ramiñcations is known as the police power, is an exercise of the sovereign right of the Government to protect the * * * general welfare of the people, and is paramount to any rights under contracts between individuals. ’ 199 U. S. at 480. Once we are in this domain of the reserve power of a State we must respect the 'wide discretion on the part of the legislature in determining what is and what is not necessary.’ Ibid. So far as the constitutional issue is concerned, 'the power of the State when otherwise justified,’ Marcus Brown Co. v. Feldman, 256 U. S. 170, 198, is not diminished because a private contract may be affected”. (Emphasis added.)
Appellant’s argument that Blaisdell and Hahn are inapplicable here because those "cases involve mortgage contracts between private parties”, not "the government’s own contractual debt obligations”, is absolutely devoid of merit. While Blaisdell and Hahn did involve private contracts, more significantly, the Supreme Court in Blaisdell expressly applied the "reservation of essential attributes of sovereign power * * * read into contracts” to "all contracts, whether made between States and individuals, or between individuals only” (290 US, at p 435). It reiterated the rule that all contracts are made subject to this paramount authority (see Veix v Sixth Ward Assn., 310 US 32, 38). So, too, in Hahn, the Supreme Court stated that the "protective power of the State” is to be "treated as an implied condition of every contract” (326 US, at p 232). "All contracts” include those which contain the faith and credit pledge.
Appellant’s attempt to distinguish between public and private contracts was even more particularly disposed of by the United States Supreme Court in Faitoute Co. v Asbury Park (316 US 502, 504). There, a statute was enacted "to meet the public emergency arising from a default in the payment of municipal obligations, and the resulting impairment of public credit” (Laws of NJ, 1931, ch 340, § 405). There, the New Jersey legislation, in providing for a denial to the holders of municipal obligations of the right to recover thereon and for a composition plan without their consent, under which the obligations would be substituted by securities authorized by *753 the plan of adjustment, went far beyond the scope of the Emergency Moratorium Act. There, the highest court in the land, in rejecting the by then threadbare claim of unconstitutionality stated (pp 513-514): "If a State retains police power [to alter contracts] with respect to building and loan associations, Veix v. Sixth Ward Assn., 310 U. S. 32, 38, because of their relation to the financial well-being of the State, and if it may authorize the reorganization of an insolvent bank upon the approval of a state superintendent of banks and a court, but over the dissent of one-fourth of the depositors (except preferred or secured claimants), Doty v. Love, 295 U. S. 64, a State should certainly not be denied a like power for the maintenance of its political subdivisions and for the protection not only of their credit but of all the creditors”. (Emphasis added.)
Since the early days, an impregnable axiom has been that the State has the "same undeniable and unlimited jurisdiction over all persons and things, within its territorial limits, as any foreign nation; where that jurisdiction is not surrendered or restrained by the constitution of the United States” (City of New York v Miln, 11 Pet [36 US] 102, 139). The police power of the State, difficult of exact definition and demarcation, is but another name for the basic authority inherent in every sovereignty to pass all laws for the internal regulation and government of the State, necessary for the public safety and welfare (Nebbia v New York, 291 US 502, 523-524; People v Budd, 117 NY 1, 14). It is one of the necessary attributes of civilized government (Ives v South Buffalo Ry. Co., 201 NY 271, 300).
Just as the parties may not alienate or withdraw the police power from their contracts, likewise, it has been established by repeated decisions that this overriding power of the State, to establish all regulations necessary to secure the health, safety or general welfare of the community, can neither be abdicated nor bargained away by the State, all contract rights being subject to its fair exercise (Chicago & Alton R. R. Co. v Tranbarger, 238 US 67, 76-77). The State may not surrender or bind itself not to exert its police power (Phillips Petroleum Co. v Jenkins, 297 US 629, 635). It has also been observed that, since in all cases it is beyond the authority of the State or its municipalities to abrogate this power so necessary to the public safety, the exercise of the police power cannot be limited by contract and it is immaterial on what consideration *754 the contract rests (see 16 Am Jur 2d, Constitutional Law, § 299, p 587).
Of course, the police power is to be exercised within constitutional limitations (Kovacs v Cooper, 336 US 77, 83; People v Griswold, 213 NY 92). An intent to exclude the State from exerting its police power must be clearly manifested (cf. Allen-Bradley Local v Employment Bd., 315 US 740, 749; State v Traffic Tel. Workers Federation of N. J., 2 NJ 335 [1949]). Here, there is no proscription against or limitation of the police power in respect to city indebtednesses which embrace a pledge of faith or credit—in section 2 of article VIII or in any other provision of the State Constitution. Thus, we have here no conflict between the police power exercise in the Emergency Moratorium Act and a constitutional provision.
V
It is readily conceded that the constitutional prescription of a pledge of faith and credit is operative in the event of mere "difficult economic circumstances”, as suggested by the majority (p 736). The situation here, however, far transcends such a rather common municipal predicament. Here, there are not merely difficult economic circumstances but rather such a "grave public emergency” that there is an "imminent danger that the city of New York will be unable * * * even to provide those basic services essential to the health, safety and welfare of its inhabitants and the continuation of orderly government in the city.” (L 1975, ch 874, § 1.) Here, there is not a mere incantation of financial emergency; the grave public emergency is live and a real one. This calls for the same "postulate of the legal order” and "government which retains adequate authority to secure the peace and good order of society” spoken to in Blaisdell (290 US 398, 435, supra); the same "sovereign right of the Government to protect the * * * general welfare of the people” addressed in Hahn (326 US 230, 232, supra); and the same "power [of a State] for the maintenance of its political subdivisions” mentioned in Faitoute (316 US 502, 514, supra).
The gravamen of the majority’s argument is that the pledge of faith and credit in section 2 of article VIII of the State Constitution makes this case distinguishable from all others. But, even taking that view, the faith and credit pledge can be no more than an expression of the Federal contract clause in a specific provision in the State Constitution. And, that being *755 so, the line of cases beginning with Blaisdell are applicable and firmly lay to rest this argument as well.
The Federal decisions, such as those in Blaisdell, Hahn and Faitoute, should not be dismissed as (p 740) "casting] little light on the State constitutional issues in this case.” This is particularly so when examining the constitutionality of a statute, where every intendment is in favor of the statute’s validity (Farrington v Pinckney, 1 NY2d 74, 78). Those cases deal with State moratorium laws, as here. They juxtapose and then harmonize constitutional provisions regarding the strict enforcement of contract terms and the police power of a State to enact moratorium laws in times of emergency for the general welfare and to insure the continuity of government. As such, those holdings from the Nation’s highest court, when applied to the instant fact pattern, are not only relevant but should be controlling—in pointing out the supremacy of the inherent sovereign power of the State over contracts when an "emergency may furnish the occasion for the exercise of [that] power” (Blaisdell, supra, p 426). In them we find reiteration of the rule that "all contracts are made subject to this paramount authority” (Veix v Sixth Ward Assn., 310 US 32, 38, supra). The manner in which the Supreme Court has analyzed the Federal contract clause in similar situations should now serve as a stare decisis precedent to be followed in our analysis in respect to our own State constitutional provisions when those provisions might be interpreted as limiting police powers.
The majority states that "in denying access to the courts there is in effect a denial of all remedy” and that "denial of a remedy is a denial of the right” (p 736). This is contrary to the principle expressed in Blaisdell, referred to by the majority for its proposition. In Blaisdell, it was pointed out that " '[w]ithout impairing the obligation of the contract, the remedy may certainly be modified’ ” (290 US, at p 430), that the constitutional provision regarding impairment of contracts is (p 434) "qualified by the measure of control which the State retains over remedial processes” and that (p 445) "the integrity of the mortgage indebtedness is not impaired”. There, the issue was the reasonableness of a suspension of the mortgagee’s right to foreclose or bring an action for a deficiency judgment for a period up to two years. Here, the issue is the reasonableness of the suspension of the noteholders’ right to commence an action during the three-year moratorium period. *756 There and here, provisions were made for the payment of interest. Not only do the principles expressed in Blaisdell support a finding of constitutionality but the similarity of facts manifest that what the Legislature has done here is to effect no greater an impairment than in Blaisdell. So too, this court sustained the validity of two sections of the former Civil Practice Act which provided that during an emergency period an action to recover a money judgment for any indebtedness secured by a mortgage could not be maintained after the mortgaged premises had been sold under a judgment of foreclosure and sale, unless the right to a deficiency judgment was determined in the foreclosure action. This court then held explicitly that "reasonable limitations and restrictions may be placed upon actions to recover the debt, in order to meet conditions which constitute an imminent danger to the public welfare” (Honeyman v Hanan, 275 NY 382, 395, app dsmd 302 US 375).
Although the faith and credit clause of the State Constitution and its implications are said to be the "crux” of the case, the majority then states that the fourth paragraph of section 2 of article VIII "confirms” that the Emergency Moratorium Act (p 737) "would boldly override constitutional limitations.” The majority’s analysis of this paragraph does not, however, support this statement. Since the majority uses the fourth paragraph merely to "confirm” its position, it is unnecessary to analyze fully the varying interpretations of this paragraph urged by appellants and respondents. The following comments should suffice.
First, the majority’s analysis concerns only tax anticipation notes (TANS) and revenue anticipation notes (RANS) (the latter of which are here involved) which are not retired within five years after the date of original issue. The other obligations involved herein are bond anticipation notes (BANS) which, although mentioned elsewhere in the fourth paragraph, are not referred to in that portion of the paragraph analyzed by the majority. Thus, insofar as the majority seeks to confirm its position through an analysis of the fourth paragraph, its analysis is incomplete in that it neglects the provisions concerning BANS which provisions might not so easily be urged in confirmation of its position.
Secondly, the majority interprets the fourth paragraph as not allowing "discretion” with respect to the setting aside and application of first revenues at the suit of any holder of *757 defaulted obligations. This interpretation disregards the words of the provision. Throughout the fourth paragraph the word "shall” is used to express the mandatory nature of the procedures described therein. The last sentence, however, which the majority interprets as eliminating discretion, uses the words "may be required” to describe the procedures with respect to the setting apart and application of such revenues by the fiscal officer. This difference in wording manifests that the drafters of the fourth paragraph intended that whether to impose such a requirement at the suit of a holder is to be left to the discretion of the courts. Thus, in this sense also, the fourth paragraph does not confirm the majority’s position.
Lastly, even assuming, but not conceding one whit, that there is such a mandate, in times where the very existence of government is threatened, the holding in the Blaisdell line of cases is ample precedent for the exercise of the State’s police power at the expense of the contract.
In response to the majority suggestion (p 739), it is inappropriate to equate a freely elected Legislature’s attempt to fashion a plan, not unlike those previously approved by this court and the United States Supreme Court in similarly severe situations, to avert the fiscal collapse of a government in the interests of the safety, health and welfare of the people, with a totalitarian or dictatorial Nation’s debasement of an "elegantly phrased” Constitution.
VI
Over and above the sound legal principles thus far expressed, further support for the constitutionality of the Emergency Moratorium Act is expressly articulated in the State Constitution itself, the very same document as that upon which the majority attempts to ground its holding. Section 25 of article III of the State Constitution explicitly and broadly states:

"[<Continuity of state and local governmental operations in periods of emergency.]

"Notwithstanding any other provision of this constitution, the legislature, in order to insure continuity of state and local governmental operations in periods of emergency caused by enemy attack or by disasters (natural or otherwise), shall have the power and the immediate duty (1) to provide for prompt and temporary succession to the powers and duties of public *758 offices, of whatever nature and whether filled by election or appointment, the incumbents of which may become unavailable for carrying on the powers and duties of such offices, and (2) to adopt such other measures as may be necessary and proper for insuring the continuity of governmental operations.
"Nothing in this article shall be construed to limit in any way the power of the state to deal with emergencies arising from any cause”. (Emphasis added.)
The majority states that the invocation of this constitutional clause is of little avail. However, the most compelling criterion in the interpretation of a Constitution is the language itself (People v Carroll, 3 NY2d 686, 689), the words employed being presumed to have been employed in their natural and ordinary meaning (People ex rel. Balcom v Mosher, 163 NY 32, 36). The language of this provision (art III, § 25) is explicit and unambiguous in granting power to the Legislature and, under long-established rules of construction, the court is generally precluded from looking elsewhere for its meaning and the scope of the power conferred (Matter of Taylor v Sise, 33 NY2d 357, 363). "Courts are reluctant to import into the Constitution that which is not there” (Matter of Sullivan v Hoberman, 34 AD2d 6, 9, affd 28 NY2d 667; People ex rel. Gilbert v Wemple, 125 NY 485, 489). Section 25 applies to periods of emergency caused by disasters, natural or otherwise. To interpret this section so as to apply to only certain disasters and not to others would violate the most basic rules of constitutional interpretation.
The Constitution of the State, as set forth in section 25, is presumed to have been prepared with the very greatest deliberation and to have been adopted only after every opportunity for reflection upon the meaning of each word was had by different Legislatures and the people at large; and when such language has a definite meaning, as here, it is not permissible to indulge in speculation in order to restrict and thereby alter the meaning (People ex rel. Gilbert v Wemple, 125 NY 485, 489-490, supra; Settle v Van Evrea, 49 NY 280; cf. Meltzer v Koenigsberg, 302 NY 523, 525). Regardless of the intention expressed in the memorandum of the Joint Legislative Committee on Interstate Cooperation and even though the emergency clause of the State Constitution was triggered originally by fear of war or nuclear attack, the cold hard fact remains that the amendment as actually passed by two Legislatures and as approved by the electorate encompasses other sitúa *759 tions as well. This amendment, this broad constitutional provision, "speaks for itself’ and includes not only emergency by enemy attack but also emergencies by disasters, natural or otherwise. It also guards against a construction limiting "in any way the power of the state to deal with emergencies arising from any cause.” (NY Const, art III, § 25.)
Any argument that might be advanced to the effect that said section is not applicable in this situation disregards the words of section 25. In the first place, by the last paragraph, there is continued recognition of the police power of the State "to deal with emergencies arising from any cause”. Furthermore, the title embraces "[continuity of * * * local governmental operations in periods of emergency”, one of the legislatively expressed objects of the Emergency Moratorium Act. The first paragraph brushes aside any other provision of the State Constitution and authorizes the Legislature, "in order to insure continuity of * * * local governmental operations in periods of emergency caused by * * * disasters (natural or otherwise) * * * to adopt such * * * measures as may be necessary and proper for insuring the continuity of governmental operations.” Since there properly was found a "grave public emergency” and "an imminent danger that the city of New York will be unable * * * even to provide those basic services essential to the health, safety and welfare of its inhabitants and the continuation of orderly government in the city,” the Legislature had not only the "power” but the "immediate duty” to adopt the questioned measure. A city of eight million, deprived of even the most basic of services, would be a terrible tragedy, nothing short of a disaster, and an emergency, dire and critical in nature (see Matter of Orans, 45 Misc 2d 616, 637, affd 15 NY2d 339).
Section 25 of article III of the State Constitution was adopted as an amendment on November 5, 1963, becoming effective January 1, 1964. The "faith and credit” provision of section 2 of article VIII is part of the Constitution which was adopted November 8, 1938 and became effective January 1, 1939. In construing the Constitution, it is to be read as a whole and every relevant provision of it is to be construed, if possible, so as to give effect to every other provision (Matter of Social Investigator Eligibles Assn. v Taylor, 268 NY 233, 237; People ex rel. Balcom v Mosher, 163 NY 32, 36, supra; People ex rel. McClelland v Roberts, 148 NY 360, 367). Thus, while under section 2 of article VIII, no city shall contract an
*760 indebtedness unless it pledges its faith and credit for payment, under section 25 of article III in "periods of emergency” arising from any cause the Legislature "in order to insure continuity of * * * local governmental operations * * * shall have the power and the immediate duty * * * to adopt such other measures as may be necessary and proper for insuring the continuity of governmental operations” and nothing in article III "shall be construed to limit in any way the power of the state to deal with emergencies arising from any cause.” So viewed, the provisions are harmonized and under the explicit authorization of section 25 of article III the Legislature was empowered to adopt the Emergency Moratorium Act for the City of New York to insure "the continuation of orderly government in the city” and to avoid "the disastrous consequences * * * of an inability by the city to meet its financial and governmental responsibilities in full.” (L 1975, ch 874, § 1.) Granted for discussion that there may be repugnancy between section 2 of article VIII (incorporated in the original document) and section 25 of article III (which came into being by way of amendment) and, further, that the sections cannot be construed so as to leave them both stand, then the amendment must prevail as the latest expression of the constitutional will of the people (People ex rel. Williams’ Eng. & Contr. Co. v Metz, 193 NY 148, 157; People ex rel. Killeen v Angle, 109 NY 564, 575).
VII
In summary, the New York City Emergency Moratorium Act of 1975, viewed from either of two standpoints, is constitutional.
It is a valid exercise of the police power of the State in a period of unquestioned grave public emergency, which power is necessary for the public welfare and may not be surrendered by the State. No provision of the State or Federal Constitutions prohibits the exercise of this power in respect to debts of the city which have a pledge of faith and credit. Similar police power legislation effecting moratoriums in similar emergencies have been approved by the United States Supreme Court and the Court of Appeals, time and time again.
The act is explicitly authorized by section 25 of article III of the State Constitution, an amendment adopted in 1963, which, without ambiguity, provides that "[notwithstanding any other *761 provisions of this [State] constitution, the legislature, in order to insure continuity of * * * local governmental operations in periods of emergency * * * shall have the power and the immediate duty * * * to adopt such * * * measures as may be necessary and proper for insuring the a continuity of governmental operations.”
I dissent and vote to affirm the order of the Appellate Division.
Judges Jasen, Gabrielli, Jones and Wachtler concur with Chief Judge Breitel; Judge Cooke dissents and votes to affirm in a separate opinion; Judge Fuchsberg taking no part.
Order reversed, etc. [See 40 NY2d 1088, 1094.]

 Defined by statute as tax anticipation notes, bond anticipation notes, revenue anticipation notes, budget notes and urban renewal notes of the city which are outstanding on the effective date of the act.