Oliver C. Sutton, J.
This is an action for declaratory judgment wherein plaintiffs challenge the constitutionality of New York City Local Law, 1975, No. 1 of the City of New York and seek injunctive relief against its implementation and enforcement. Defendants, City of New York, Mayor Abraham D. Beame, and Acting City Clerk Thomas A. Lenane, move for summary judgment dismissing the complaint.
Local Law, 1975, No. 1 (hereinafter referred to as "LL-l” or "the ordinance”), effective January 8, 1975, and codified as section 1106-5.0 of the Administrative Code of the City of New York, requires various elected officials, city executive and administrative personnel to file with the city clerk annual statements disclosing information of a personal financial nature. The statements are to be made available for inspection to any taxpayer of the city who applies in the manner set forth in sections 1113 and 1114 of the New York City Charter. An intentional violation of LL-l constitutes a misdemeanor *564 punishable by a fine of $1,000 or a prison term of not more than one year, or both. Enforcement and implementation of LL-1 has been enjoined by the issuance of a preliminary injunction, filed on November 17, 1975.
Although LL-1 does not contain a declaration of policy, the papers before the court make it clear that it is the object of this ordinance to discourage and detect corruption and the appearance of corruption, avoid conflicts of interest, and instill in the public a sense of confidence in the integrity and impartiality of the public service. This objective is sought to be accomplished by requiring upper echelon officials to account to the public with respect to certain outside financial interests. Those required to file statements include the Mayor, City Council President and members, Borough President, Comptroller, and candidates for such positions, each head of an administration, deputy administrator, assistant administrator, agency head or board member of such agency, commissioner, deputy commissioner, assistant commissioner, and "each city employee whose salary is twenty five thousand dollars a year or more”.
Each of the 18 individual plaintiffs is an employee in the classified civil service of the City of New York not holding an exempt position. They include police, fire, sanitation, medical, housing, correction and teaching personnel. They are joined in the action by 11 associations or organizations representing various titles in the classified civil service. Each individual plaintiff is either an officer of one of the organizational plaintiffs or earns in excess of $25,000 a year in base pay or in base pay, overtime and night differential.
Plaintiffs purport to bring the action in a representative capacity on behalf of all other individuals and organizations similarly situated, too numerous to join. Although the answer denies the usual allegation of common questions of fact and law, the briefs and other papers submitted by the defendants do not seriously dispute the propriety of class action status. The court therefore deems it appropriate that this action be maintained as a class action. The class shall be described as all individuals in the noncompetitive labor and competitive classes of the classified civil service of the City of New York earning a salary of $25,000 a year or more, inclusive of base pay, overtime, night differential and all other forms of additional compensation.
Prior to reaching the merits of the constitutional issues *565 raised herein, defendants’ first affirmative defense warrants attention. The allegation is there made — and it is not denied— that 10 of the plaintiffs lack standing to sue as their base pay does not exceed $25,000. An affidavit submitted by the acting city clerk, the officer charged with the enforcement of LL-1 and whose interpretation is to be accorded great weight (Matter of Mounting Finishing & Co. v McGoldrick, 294 NY 104, 108), states that only those whose base pay exceeds $25,000 are required to file statements; that is, such additional forms of compensation as overtime and night differential are not to be considered in determining whether an employee earns the minimum salary to which LL-1 is applicable.
The court finds the defendants’ reading of the word "salary” consistent with the purpose, object and spirit of the ordinance (see McKinney’s Cons Laws of NY, Book 1, Statutes, § 96) to define managerial responsibility in terms of a minimum level of compensation. It appears totally unrelated to this definitional task to include overtime, night differential and other not necessarily constant forms of compensation within the stated minimum salary. On the other hand defendants’ interpretation of the word "salary” is buttressed by the manner in which the civil service system endeavors to classify the responsibilities attributable to the various positions in civil service and to allocate to each classification a "salary grade” commensurate with the responsibilities involved (cf. Civil Service Law, §§ 121, 130; NY City Civ Serv Comm Rules & Regulations, rule XI). Levels of responsibility, in other words, are correlated to categories or grades defined in terms of minimum and maximum salaries; additional compensation above the minimum but within a particular grade is not deemed a promotion entailing a new level of responsibility and training.
Accordingly, the court holds that those 10 plaintiffs whose base pay does not exceed $25,000 a year fail to present a real and justiciable controversy, and accordingly, summary judgment is granted dismissing the complaint against the plaintiffs Hunter, Melnick, Crowley, Sheridan, Sisto, Riordan, Caldwell, Frendville, Mandanici and Lombardo. It is suggested that the city clerk revise his "Information Manual on Disclosure of Financial Interests Pursuant to Local Law Sec. 1 of 1975” so that it precisely advises city employees that they are required to file statements only if their base pay exceeds $25,000.
Plaintiffs’ constitutional challenge is founded primarily on *566 an asserted violation of their fundamental rights of privacy and freedom of association occasioned by the overbreadth of the reporting and disclosure requirements contained in LL-1. In addition, they argue that LL-1 denies due process of law in that no procedure is made available whereby the propriety or need for disclosure of personal matters unrelated to a particular employee’s job can be challenged in individual cases. They assert it violates the equal protection clause in that no rational basis exists for distinguishing between employees earning at least $25,000 and those earning less, and, further, that it is unconstitutionally vague in several respects. Various provisions of the New York State Constitution are also alleged to be violated by LL-1.
Defendants respond that LL-1 is a valid exercise of the police power in furtherance of efficient and ethical government. Further, and upon the assumption that plaintiffs enjoy a right of privacy with respect to their financial affairs, defendants urge that any infringement thereof is outweighed by the public’s right to know of matters bearing upon actual and potential conflicts of interests.
Plaintiffs assert that LL-1 is the most far-reaching financial disclosure law in the country — a characterization not challenged by the defendants. Before considering plaintiffs’ argument, it might serve to set forth the financial particulars which must be disclosed (Administrative Code, § 1106-5.0):
"b. The report shall contain the following information:
"1. List the name, address and type of practice of any professional organization in which the person reporting or his spouse, is an officer, director, partner, proprietor or employee, or serves in any advisory capacity, from which income of one thousand dollars or more was derived during the preceding calendar year.
"2. List the source of each of the following items received or accrued during the preceding calendar year by the person reporting or his spouse.
"(a) any income or services rendered * * * of one thousand dollars or more;
"(b) any capital gain from a single source of one thousand dollars or more other than from the sale of a residence occupied by person reporting;
"(c) reimbursement for expenditures of one thousand dollars or more in each instance;
*567 "(d) honoraria from a single source in the aggregate amount of five hundred dollars or more;
"(e) any gift in the aggregate amount or value of five hundred dollars or more from any single source received during the preceding year, except as otherwise provided under the election law covering campaign contributions.
"3. List each person to whom the person reporting or his spouse was indebted for a period of ninety consecutive days or more during the preceding calendar year in an amount of five thousand dollars or more.
"4. List the identity of each investment and each parcel of real property in which a value of twenty thousand dollars or more was held by the person reporting or his spouse at any time during the preceding calendar year, based on the cost thereof or when acquired by means other than purchase, an estimate of the value at the time of receipt.
"5. List the identity of each trust or other fiduciary relation in which the person reporting or his spouse held a beneficial interest having a value of twenty thousand dollars or more during the preceding calendar year.”
In each instance, the extent of the financial interest is not to be designated in specific dollar sums but rather as falling within categories of graduated monetary amounts.
There can be no doubt that "[t]he State has an undeniably strong interest in placing beyond question the integrity of public service.” (Troopers Lodge No. 41, Fraternal Order of Police v Walker, 419 US 1058, 1059, Douglas, J., concurring in den cert). Plaintiffs do not suggest that the problem is an illusory one, and freely concede that legislative efforts designed to discourage and detect corruption and conflicts of interest fall within the police power of the governing authority. Thus, the constitutional questions here go not to the basic power of the city council to legislate in this area, but to whether the specific legislation which has been enacted interferes with constitutionally protected rights. (Cf. Buckley v Valeo, 424 US 1.)
Foremost among such rights asserted herein is that of privacy. Plaintiffs’ assertion is based upon numerous decisions of the Supreme Court of the United States finding a right of privacy emanating as penumbras from various provisions of the Bill of Rights (Griswold v Connecticut, 381 US 479) including the right of association under the First Amendment *568 (Talley v California, 362 US 60; NAACP v Alabama, 377 US 288; Bates v City of Little Rock, 361 US 516), freedom from unreasonable search and seizure under the Fourth Amendment (United States v United States Dist. Ct., 407 US 297; Katz v United States, 389 US 347), the right against self incrimination under the Fifth Amendment (Boyd v United States, 116 US 616), the retained rights of the people under the Ninth Amendment (Griswold v Connecticut, supra, pp 491-492, Goldberg, J., concurring) and the due process clause of the Fourteenth Amendment (Roe v Wade, 410 US 113).
From the above cases, plaintiffs derive a fundamental right of privacy surrounding one’s financial affairs and proceed to argue that the police power must be exercised with scrupulous regard so as to minimize any resulting infringement upon such right. This is to say that the city must demonstrate that LL-1 is necessary and not merely rationally related to the accomplishment of a compelling governmental purpose. There is no doubt that this is the accepted method of review utilized to test the constitutionality of governmental efforts to regulate activities constitutionally subject to regulation which tend, however, to curtail or inhibit constitutionally protected freedoms. (Griswold v Connecticut, supra, pp 485, 497-498; NAACP v Alabama, supra, p 307; Shelton v Tucker, 364 US 479, 488; Kesselbrenner v Anonymous, 33 NY2d 161, 165; Atkin v Onondaga County Bd. of Elections, 30 NY2d 401, 404-405.)
Plaintiffs suggest that the invasion of privacy necessarily effected by the operation of LL-1 could be avoided, or at least minimized, through the use of narrower means competent to accomplish the legitimate purpose of the ordinance. This overbreadth argument is aptly summarized in plaintiffs’ brief in the following terms: "[LL-1] requires too much information from too many people to be disclosed too widely.” The quoted sentence is deceptively simple for it actually entails a threefold argument. First, it is said that LL-1 is not confined to policymakers alone (or those city employees particularly vulnerable to conflicts of interests and who presumably are the targets of the $25,000 threshold) but also requires reporting and disclosure from city employees whose functions are non-managerial in nature. As a narrower alternative, plaintiffs suggest that manageriality be determined on a job-by-job basis. Second, plaintiffs argue that LL-1 fails to relate the reporting and disclosure requirements to financial dealings or *569 assets which might be expected to give rise to a conflict of interest such as those which have some bearing upon the functions or jurisdiction of a particular agency or of a particular public officer or employee (cf. City of Carmel-by-the-Sea v Young, 2 Cal 3d 259.) As a narrower alternative in this respect, plaintiffs suggest confidential and individualized administrative determinations as to whether particular assets or dealings bear such relationship so as to make public disclosure appropriate. Finally, plaintiffs argue that privacy might yet be preserved in the face of broadly drawn reporting requirements by limiting public access to the financial statements or by deleting the requirement that sources of income be precisely identified.
Implicit in plaintiffs’ argument is the assumption that a right of privacy extends to one’s financial affairs. The defendants squarely confront this argument by asserting the public’s right to know as an overriding value or interest. Relied upon in this regard are: (1) numerous Supreme Court decisions holding or reiterating that the right to receive information is the fundamental counterpart of free speech (Barr v Matteo, 360 US 564; New York Times v Sullivan, 376 US 254; Curtis Pub. Co. v Butts, 388 US 130, 164; Red Lion Broadcasting Co. v FCC, 395 US 367, 390; Rosenbloom v Metromedia, 403 US 29); (2) Supreme Court decisions sanctioning reporting requirements as devices necessary to enforce a particular regulatory scheme (Flint v Stone Tracy Co., 220 US 107; Shapiro v United States, 335 US 1; United States v Darby, 312 US 100; California Bankers Assn. v Schultz, 416 US 21; Buckley v Valeo, 424 US 1, supra); and (3) decisions of the highest courts of several sister States upholding financial disclosure laws at least in part on the basis of the public’s right to know (Illinois State Employees Assn. v Walker, 57 Ill 2d 512, cert den sub nom Troopers Lodge No. 41 v Walker, 419 US 1058, supra; Fritz v Gorton, 83 Wash 2d 275, app dsmd sub nom Simmons v Gorton, 417 US 902; Montgomery County v Walsh, 274 Md 502, app dsmd 424 US 901).
The briefs submitted to the court seem to anticipate a need for judicial line drawing or balancing as between the public’s right to know and the individual’s right of privacy. In other words, both sides urge, plaintiffs directly and defendants implicitly, that in addressing the constitutional claim, the standard of review to be applied by the court should be that of strict scrutiny. The court, however, is of the view that this *570 type of analysis is uncalled for as it is by no means manifest that an expectation of privacy with respect to one’s financial affairs is a fundamental right entitled to special constitutional safeguards. And "it is only the existence of a fundamental right which triggers the further requirement that the enactment not sweep too broadly into this area of fundamental freedom.” (Matter of Kading, 70 Wis 2d 508, citing Griswold v Connecticut, 381 US 479, supra; NAACP v Alabama, 377 US 288, supra, and Shelton v Tucker, 364 US 479, supra.)
The Supreme Court has yet to hold that the right of privacy extends to protect against disclosure of financial affairs. (Matter of Kading, supra.) The point was well developed, and the pertinent authorities cited, by the Court of Appeals of Maryland in Montgomery County v Walsh (supra, pp 512-513): "The Supreme Court emphasized in Roe v. Wade, supra, 410 U. S. at 152, however, that only personal rights that can be deemed 'fundamental’ or 'implicit in the concept of ordered liberty’ are included in the constitutional guarantee of personal privacy. Stated another way, '[i]f the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.’ Eisenstadt v. Baird, 405 U. S. 438, 453, 92 S. Ct. 1029, 1038, 31 L.Ed.2d 349, 362 (1972). If these pronouncements hint that the constitutional right of privacy is of limited scope and not to be lightly applied, Paris Adult Theatre I v. Slaton, 413 U. S. 49, 93 S. Ct. 2628, 37 L.Ed.2d 446 (1973), makes it explicit. In that case, the Court referred to the right of privacy, as developed in Griswold and Wade, as the 'right to intimacy’ and said that '[t]his privacy right encompasses and protects the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing.’ 413 U. S. at 65-66. It is thus clear that the Supreme Court has yet to extend the right to privacy much beyond the context of intimate relationships. It is not, therefore, coextensive with every intrusion actionable under the tort of invasion of privacy, nor does it protect rights merely 'important’ and not 'fundamental.’ Cf. San Antonio Independent School District v. Rodriguez, 411 U. S. 1, 93 S. Ct. 1278, 36 L.Ed.2d 16 (1973). That protecting the confidentiality of individual financial matters is important cannot be doubted; that it is a 'fundamental’ right 'implicit in the concept of ordered liberty’ is anything but certain.”
*571 In Illinois State Employees Assn. v Walker (57 Ill 2d 512, supra) the Supreme Court of Illinois, in upholding broad financial disclosure by employees earning a salary in excess of $20,000 a year, rejected the notion that a zone of privacy surrounds one’s financial affairs in the following terms (p 524): "We do not deal in this case with the most intimate relationship of husband and wife or with an effort by the State to control their decisions as to whether and when to have their children. We deal rather with a requirement that the financial affairs of persons who are paid by the public and who occupy positions of high public trust be disclosed.”
The Walker case presents the predominant position of the State cases in the area. Evans v Carey, 53 AD2d 109, affd 40 NY2d 1008.)
Plaintiffs point to California Bankers Assn. v Powell (416 US 21, 78-79) wherein Justice Powell stated, in a concurring opinion upholding the Bank Secrecy Act: "In their full reach, the reports apparently authorized by the open-ended language of the Act touch upon intimate areas of an individual’s personal affairs. Financial transactions can reveal much about a person’s activities, associations, and beliefs. At some point, governmental intrusion upon these areas would implicate legitimate expectations of privacy. Moreover, the potential for abuse is particularly acute where, as here, the legislative scheme permits access to this information without invocation of the judicial process.”
However, the Supreme Court majority opinion in California Bankers did not find it necessary to pass upon the question of whether there is a zone of privacy surrounding an individual’s financial affairs. This court is constrained by the familiar rule of construction that legislation will be declared unconstitutional only in a clear case. The challenged legislation must be manifestly, undoubtedly, clearly, plainly, substantially and palpably inconsistent with the constitutional standard; its invalidity must be shown conclusively. (8 NY Jur, Constitutional Law, § 79.) In view of the Supreme Court’s consistent refusal to review sister State cases upholding financial disclosure laws (Troopers Lodge No. 41 v Walker, 419 US 1056, supra; Stein v Howlett, 412 US 925; Simmons v Gorton, 417 US 902, supra; Montgomery County v Walsh, 424 US 901, supra), the most that can be said as to the right of privacy, as asserted herein, is that it is still a topic of fair debate. The fact that these sister State enactments are less sweeping than *572 LL-1, or contain exceptions or provide apparatus designed to protect privacy, does not establish that a right of privacy exists with respect to one’s financial affairs.
The problem not being one of constitutional right, it becomes unnecessary to decide whether LL-1 meets the stricter constitutional test looking to the substantiality of the governmental interest and the narrowness of the means employed to implement that interest. Rather, a more lax standard of rationality is applicable; the test is whether the means employed by LL-1 are "reasonable and appropriate” to accomplish its legitimate purposes. (Matter of People [Tit. & Mtge. Guar. Co.], 264 NY 69, 83.) Under this method of review, challenged legislation will not be set aside if any state of facts reasonably may be conceived to justify it. (United States v Carolene Prod. Co., 304 US 144, 154; McGowen v Maryland, 366 US 420, 425-426; Defiance Milk Prod. Co. v Du Mond, 309 NY 537, 540-541.) This implies a large degree of discretion in the governing authority to determine the means appropriate to protect the public welfare (Grove Hill Realty Co. v Ferncliff Cemetery Assn., 7 NY2d 403, 410); hence, the city council is entitled to considerable leeway in its determination as to the who, what and how of disclosure.
Concerning the question of who must file financial statements, the means employed by LL-1 is to set a base salary level of $25,000. Plaintiffs argue that the standard indicates nothing about an individual’s level of responsibility for personnel with identical titles, duties and authority may fall on either side of the line depending upon such fortuitous circumstances as seniority and merit increases. Accordingly, it is said that the classification is without any reasonable connection to the governmental object intended to be served by LL-1 and is therefore a denial of equal protection.
It is true that dissimilar treatment of employees with identical duties, arbitrarily imposed, would constitute a denial of equal protection. The problem of additional pay, and the affidavit of the acting city clerk bearing upon that subject, have already been discussed in connection with overtime and shift differential. The same reasoning should apply to all other forms of additional pay not constituting a promotion within the meaning of the Civil Service Law, no matter how described, be they termed scheduled salary increases, annual increments, increased minimum salaries, fringe benefits, merit awards, holiday pay, cost-of-living increases or salary adjust *573 ments upon reallocation of a position to a higher salary grade. Indeed, the prospect of arbitrary enforcement would appear to be largely eliminated if the application of LL-1 were limited to those titles which fell within or above a minimum salary grade of $25,000 as of January 8, 1975, the effective date of the ordinance. The court so holds in accordance with its obligation to construe legislation so as to avoid the possibility that it will conflict with the Constitution. The meaning of acts should not be "stretched to cover situations having no real or reasonable relation to those evils * * * especially when to do so would render the statute unconstitutional.” (People v Bell, 306 NY 110, 114.)
Even so, fault can likely be found with what might reasonably appear to many to be an arbitrary divide. Except for the examination announcements of some of the titles represented in this action, the record is devoid of any proof bearing upon the actual nature of the responsibilities associated with particular positions. It might well be that some individuals whose responsibilities are nonmanagerial in nature will be required to file; it might also be that other individuals whose functions are managerial will not be required to file. However, "[t]o be able to find fault with a law is not to demonstrate its invalidity. It may seem unjust and oppressive, yet be free from judicial interference. The problems of government are practical ones and may justify, if they do not require, rough accommodations — illogical, it may be, and unscientific.” (Metropolis Theatre Co. v City of Chicago, 228 US 61, 69-70.) With an eye toward instilling public confidence in the public service, the city council could well have concluded that those earning $25,000 or more presented entirely distinct problems justifying disclosure even if some nonmanagerial personnel were drawn into the classification. "Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think.” (Williamson v Lee Optical Co., 348 US 483, 489.) The "field” here is the civil service: the "different dimensions and proportions” concern a difference in base salary levels; the "different remedies” involve the need to disclose or not.
The rule that a classification, provided it has some reasonable basis, will not be held unconstitutional because it is not made with mathematical nicety or because in practice it results in some inequality (Dandridge v Williams, 397 US 471, 485; cf. Williamson v Lee Optical Co., supra, pp 487-488) has *574 particular justification in dealing with legislative efforts to sift the managerial from the nonmanagerial personnel in the public service. Mr. Justice Rehnquist had occasion to remark upon the nature of such an attempted delineation in his dissenting opinion in Sugarman v Dougall (413 US 634, 661): "The proliferation of public administration that our society has witnessed in recent years, as a result of the regulation of conduct and the dispensation of services and funds, has vested a great deal of de facto decisionmaking or policymaking authority in the hands of employees who would not be considered the textbook equivalent of policymakers of the legislative or 'top’ administrative variety. Nevertheless, as far as the private individual who must seek approval or services is concerned, many of these Towlevel’ civil servants are in fact policymakers. Goldberg v. Kelly, 397 U.S. 254 (1970), implicitly recognized that those who apply facts to individual cases are as much 'governors’ as those who write the laws or regulations the 'low-level’ administrator must 'apply.’ ”
The Sugarman case held the New York State Civil Service Law unconstitutional insofar as it imposed a flat ban on the employment of aliens in the competitive class of the classified civil service. The holding was premised upon the proposition that the statute worked to deprive a discreet minority of an interest in liberty and was therefore subject to close judicial scrutiny. (Cf. Hampton v Mow Sun Wong, 426 US 88.) However, the scrutiny required here is not so demanding as we deal neither with a suspect classification nor with a fundamental right.
Nor is it unreasonable to require disclosure of the "financial interests of the public servant’s spouse. Absent such provision, disclosure could be evaded by the simple device of transferring title to one’s spouse. And common sense tells us that the interests of one’s spouse are just as likely to give rise to a loss of impartiality as one’s own interests. (Cf. County of Nevada v MacMillen, 11 Cal 3d 662, 1353-1354; Matter of Kading, 70 Wis 2d 508, supra; Montgomery County v Walsh, 274 Md 502, supra; Illinois State Employees Assn v Walker, 57 Ill 2d 512, supra.) Nor does the required disclosure of the spouse’s interests have a chilling effect upon the right of privacy in one’s marital affairs. LL-1 does not intrude upon those most intimate phases of marriage and personal life clearly falling within the scope of privacy. (Cf. Shoresman v Burgess, 412 F Supp 831, 837.)
*575 Plaintiffs contend that defendants’ motion for summary judgment must be denied in any event because it has not been conclusively demonstrated that the titles held by the individual plaintiffs and represented by the organizational plaintiffs involve functions of a managerial or policymaking nature. An issue of fact exists; therefore, plaintiffs argue, summary judgment must be denied. However, plaintiffs’ argument disregards the presumption of validity applicable to legislation challenged on constitutional grounds. It is to be presumed that the city council made inquiry and found the necessary facts to support its determination. (De Veau v Braisted, 5 NY2d 236, 242; Lincoln Bldg. Assoc. v Barr, 1 NY2d 413, 415.) And the facts so found are deemed presumptively true. (Billie Knitware v New York Life Ins. Co., 174 Misc 978, 980, affd 262 App Div 714, affd 288 NY 682.) Nor is it of any consequence that the text of LL-1 does not contain an express legislative finding declarative of the presence of facts necessitating the implementation of corrective measures. (United States v Carolene Prod. Co., 304 US 144, 152, supra; N. H. Lyons & Co. v Corsi, 203 Misc 160, 163, affd 286 App Div 1065, affd 3 NY2d 60.)
Hence, whether or not those positions in the classified civil service which fall above a minimum salary of $25,000 involve functions or responsibilities of such a nature as to require public disclosure of outside financial interests in order to effectuate the purposes and objects of LL-1 is a question of fact which the court is constrained to deem presumptively true.
Plaintiffs’ only effort to overcome the presumption of validity falls short. They point to sections 201 (subd 7, par [a]) and 203 of the Civil Service Law and section 1173-4.1 of the Administrative Code, which provisions deny the right to bargain collectively to "managerial” employees. Allusion is then made to the fact that each job title represented in this action is certified to engage in collective bargaining; hence, it is argued that a search of the record reveals that all the job titles represented herein involve nonmanagerial functions and summary judgment, if it is to be granted at all, should be granted in favor of the plaintiffs. The court does not agree. LL-1 is not in pari materia with section 1173-4.1 of the Administrative Code, and the court has not been advised and sees no reason why the two provisions should be construed together. The city council could rationally conclude that *576 "manageriality’’ has an entirely different meaning in the present context than it does in the context of labor relations.
Moreover, a perusal of the duties, responsibilities and examples of typical tasks of those positions earning more than $25,000 a year as set forth in the examination announcements, submitted as exhibits on the motion, does not make it apparent that the classification of such positions as managerial or policymaking in nature is an arbitrary one. Indeed, such positions all seem to involve, at the very least, the application of facts to individual cases. (Sugarman v Dougall, 413 US 634, 661, supra, Rehnquist, J. dissenting.) The fact that the examination announcements state, in each instance, that the position is "subject to supervision” is at best inconclusive, and at worst, irrelevant, to the issue of manageriality.
Indeed, it might even be argued that the classification is overly discreet for it appears from the exhibits, that only a very small number of titles represented by the organizational plaintiffs earns a minimum salary exceeding $25,000. Certainly, at least for the purpose of defining a class of managerial or policymaking personnel, the $25,000 threshold represents a "reasonable margin” necessary to insure the degree of enforcement desired. (Cf. Village of Euclid v Ambler Realty Co., 272 US 365, 388-389.)
With respect to the question of what must be disclosed, the means employed by LL-1 is to specify or designate certain types of financial data. Plaintiffs correctly point out that the reporting requirements of LL-1 could extend to such areas as home improvement loans or mortgages, summer home financing, shares in a family business, education loans, judgments in litigation, gifts from family or friends, loans or gifts to pay medical expenses, and testamentary or inter vivos trusts. It is possible that a zone of privacy does surround one or another of the types of assets and transactions required to be reported under LL-1; however, the possibility is mere speculation in the present context and does not warrant holding LL-1 unconstitutional on its face. (Broadrick v Oklahoma, 413 US 601.)
There will no doubt be many instances where the reported data will not be unequivocally related to any city activity or to the public office in question, and, in such instances, it would be accurate to say that the purposes of LL-1 will not be furthered by reporting. However, it would be an insurmountable legislative task to tailor disclosure to each of a literally myriad of public posts (Fritz v Gorton, 83 Wash 2d 275, supra) *577 and an anomaly to enact a statute designed to eliminate conflicts of interests so as to permit the person affected to decide when a financial interest relates to his public employment. (Stein v Howlett, 52 Ill 2d 570.) "[I]n some fields, the bad fades into the good by such insensible degrees that the two are not capable of being readily distinguished and separated in terms of legislation.” (Village of Euclid v Ambler Realty Co., 272 US 365, 389.) Such can be said of the evil sought to be remedied by LL-1. The contours of corruptive practices and conflicts of interest are often impossible to discern until well after the fact, if at all — a circumstance borne out by the broad language of section 1106-1.0 of the Administrative Code prohibiting city employees from becoming interested directly or indirectly in any manner whatsoever except by operation of law in any business dealing with the city. The ability of the community to recognize, before the fact, assets or transactions having a direct or indirect relationship to business dealings of the city might well be enhanced by broad public disclosure. So too might the interest in guarding against the appearance of impropriety.
Finally, the availability of the financial statements to the public at large is not unrelated to the city’s purpose. It is clear that LL-1 is designed not only to prevent and detect conflicts of interest and corruptive practices, but also to foster public confidence in the integrity of the public service by creating what is referred to in the defendants’ brief as "a standard of open government.” LL-1 is concerned as much with the appearance as with the actuality of conflict of interest, a concern which "is also critical * * * if confidence in the system of representative Government is not to be eroded to a disastrous extent.” (United States Civ. Serv. Comm. v National Assn. of Letter Carriers, 413 US 548, 565.)
However undesirable — and the court is not unmindful of the possibility that LL-1 could well have a dispiriting effect upon competent, honest and high-minded citizens otherwise predisposed to employment in the public service — it is not for the court to substitute its judgment for that of the legislative authority. The city council could have decided that public confidence would be undermined absent a requirement that the financial reports be made easily accessible to the public. Or, the city council might have decided that public disclosure was the means best suited to insure that actual or potential conflicts of interests would not go undetected.
*578 Plaintiffs find additional support for their argument against public disclosure in the so-called "irrebuttable presumption doctrine” whereby a classification creating a conclusive presumption not necessarily true in fact is held unconstitutional unless the affected individual is afforded an opportunity to rebut the presumption. (Cleveland Bd of Educ. v LaFleur; 414 US 632; Stanley v Illinois, 405 US 645; Vlandis v Kline, 412 US 441.)
It is true that LL-1 does operate on at least two presumptions which are not necessarily true in fact, to wit: (1) that all city employees earning over $25,000 occupy policymaking positions, and (2) that disclosure of each item of financial information called for by LL-1 serves to prevent conflicts of interests or the appearance thereof regardless of the nature of a particular employee’s official responsibilities. Since the legislative scheme does not provide an opportunity to disprove either of these presumptions, they must be regarded as conclusive.
It should be pointed out that the absence of administrative machinery to review the propriety of public disclosure in individual cases is a feature of LL-1 which makes it significantly different from the Governor’s Executive Order No. 10 (9 NYCRR 3.10) of May 22, 1975 recently upheld by the Court of Appeals against a challenge of unconstitutionality. (Evans v Carey, 40 NY2d 1008.) Executive Order No. 10 established a "Board of Public Disclosure” with authority to review the financial statements "prior to public inspection to assure adequate compliance and to evaluate any claims of privacy.” An item could be deleted by the board pursuant to the request of any person required to file financial statements "only upon a finding that any such item is of a highly personal nature, does not in any way relate to the duties of the position held by such person, and does not create an actual or potential conflict of interest.” Financial disclosure laws upheld in several sister State decisions also made provision for some form of administrative review (Lehrhaupt v Flynn, 129 NJ Super 327; Montgomery County v Walsh, 424 US 901, supra; Illinois State Employees Assn. v Walker, 57 Ill 2d 512, supra; County of Nevada v MacMillen, 11 Cal 3d 662, supra).
However, the absence of similar administrative machinery does not render LL-1 constitutionally defective. This is because the Supreme Court has, subsequent to the line of cases relied upon by the plaintiffs, limited the irrebuttable presump *579 tion doctrine to cases involving a claim which enjoys a constitutionally protected status or a statute which purports to speak to the bona ñdes of the status of the affected party without making plainly relevant evidence of such bona ñdes admissible. (Weinberger v Salfi, 422 US 749, 779.)
LL-1 does not involve the curtailment of a right protected under the Constitution. Nor does it purport to speak per se to the bona ñdes of a particular employee’s role or status in city government as managerial or nonmanagerial, supervisory or clerical. Read together with section 1106 of the Administrative Code, its import is rather prophylactic and informational, and toward that end, it "imposes a disclosure requirement on all members of a defined class in order to discourage evasion by a substantial portion of that class.” (Mourning v Family Pub. Serv., 411 US 356, 377.) The "defined class” constitutes all city employees earning a base salary of $25,000 or more; a "substantial portion of that class” includes personnel in policymaking positions. Whether LL-1 "precisely filters out those, and only those, who are in the factual position which generated the * * * concern reflected in the statute” is not crucial. (Weinberger v Salfi; supra, p 777.) It does not even matter whether LL-1 filters out more members of the class than nonmembers. (Weinberger v Salfi, supra.) All that is needed is a rational connection between the means and the ends of the enactment and a rational conclusion by the city council "that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.” (Weinberger v Salfi, supra, pp 777, 785.) "Where, as here, the transactions and conduct which [the city council] seeks to administer occur in myriad and changing forms, a requirement that a line be drawn which insures that not one blameless individual will be subject to the provisions of an act would unreasonably encumber effective administration and permit many clear violators to escape regulation entirely”. (Mourning v Family Pub. Serv., supra, p 374.) The same reasoning should apply also to potentially blameless individuals, i.e., to those city employees whose responsibilities might not be expected to give rise to a conflict of interest.
A second constitutionally protected right assertedly violated by LL-1 is that of group association. Plaintiffs contend that the required disclosure of income sources, debts, gifts and honoria is tantamount to disclosure of political, religious, trade union, social and other forms of associational member *580 ship. It is alleged, that compelled disclosure will have a chilling effect upon such activities.
In this connection, plaintiffs rely principally upon NAACP v Alabama (357 US 449) usually cited as the leading authority for the proposition that association as well as expression is protected under the First Amendment. (Cf. Buckley v Valeo, 424 US 1, 65, supra.) It was also recognized in Alabama that compelled disclosure, in itself, entails (p 462) "the likelihood of a substantial restraint upon the exercise * * * [of the] right to associational freedom.” (Cf. Buckley v Valeo, supra.) Accordingly, the subordinating interests of the State must survive exacting scrutiny (Buckley v Valeo, supra) and are justified only if they outweigh the burden they place upon individual rights. (Buckley v Valeo, supra, p 69.)
Plaintiffs lay particular stress upon the likelihood that LL-1 will have a chilling effect upon the associational activities of the plaintiff organizations in advocating on behalf of their members in the area of labor relations. The court recognizes the possibility, if not the likelihood, that some individuals or their spouses will be deterred from assuming leadership positions in their unions furnishing compensation, reimbursement or honoria above the stated amounts set forth in LL-1. However, the court is constrained by the authority of Buckley v Valeo (supra, p 69) requiring a factual showing "that on past occasions revelation of the identity of [the organizations] rank- and-file members [had] exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility”. Plaintiffs do not present any record evidence of the type of chill identified in Alabama. (Cf. Buckley v Valeo, supra, p 71.) Absent such showing, the alleged infringement on the right of association is highly speculative (cf. Buckley v Valeo, supra, p 70) and does not justify holding the challenged legislation unconstitutional on its face.
Similar considerations apply to plaintiffs’ vagueness contentions. The exact meaning to be placed on various terms which plaintiffs find questionable presents to the court a hypothetical controversary which must await determination until an actual controversy arises. (County of Nevada v MacMillen, 11 Cal 3d 622, supra.) However, two points raised by the plaintiffs go to the core of LL-1 and should be construed at this point. First, the word "salary” shall mean the minimum salary level of the salary grade allocated to a particular title, *581 as discussed above. Second, the plain meaning of the ordinance requires a report to be filed only by the "city employee”; nothing in the subject ordinance requires that a separate report be filed by the city employee’s spouse.
Accordingly, defendants’ motion for summary judgment dismissing the complaint is granted.